591 A.2d 1168

**DEPARTMENT OF ENVIRONMENTAL RESOURCES, Petitioner,**

**v.**

**RUSHTON MINING COMPANY; Canterbury Coal Company; Duquesne Light Company; Florence Mining Company; et al., Respondents.**

Commonwealth Court of Pennsylvania.

Argued Dec. 3, 1990.

Decided May 10, 1991.

Reargument Denied July 15, 1991.

Petition for Allowance of Appeal Denied Nov. 25, 1991.

Cathleen Curran Myers, Director, Bureau of Regulatory Counsel, Harrisburg, for petitioner.

Henry Ingram, Pittsburgh, for respondents.

Before PALLADINO and PELLEGRINI, JJ., and NARICK, Senior Judge.

PELLEGRINI, Judge.

The Department of Environmental Resources (DER) appeals from an order of the Environmental Hearing Board (EHB), which granted Rushton Mining Company's and ten other coal mining companies'[1] (Coal Mine Operators) Cross–Motion for Partial Summary Judgment, and denied the DER's Motion for Partial Summary Judgment, declaring invalid fifteen standard permit conditions contained within forty-six coal mining activity permits issued by the DER.

The Coal Mine Operators in this case are the permittees of one or more underground bituminous mines in Pennsylvania. Each Coal Mine Operator was required to submit an application to the DER for a coal mining activity permit (permit) to either repermit its mine as required by 25 Pa.Code § 86.11 (relating to general requirements for permits) and 25 Pa.Code § 86.12 (relating to continued operation under interim permits), or to amend an existing permit

1. The Coal Mine Operators are comprised of Rushton Mining Company, BethEnergy Mines, Inc., Canterbury Coal Company, Duquesne Light Company, Florence Mining Company, Greenwich Collieries Division of Pennsylvania Mines Corporation, Helvetia Mining Company, O'Donnell Coal Company, Tunnelton Mining Company, U.S. Steel Mining Company, and Vista Mining Company.

by adding acreage to the permit area pursuant to 25 Pa. Code § 86.52 (relating to permit revisions).[2] Upon review of the applications, the DER approved the permits, subject to the Coal Mine Operators' compliance with the standard permit conditions contained therein. As a result of the required compliance with the standard permit conditions specifically relating to subsidence control, mapping requirements and reporting requirements, the Coal Mine Operators filed forty-six separate appeals against the DER, challenging the validity of those standard conditions.[3] The Coal Mine Operators argued that those standard conditions were regulations, because they constituted binding rules of gen-

**2.** The new permits were required, because in 1980, Pennsylvania amended its then-existing programs for regulating bituminous underground coal mining activities to enable the state to retain primary jurisdiction (primacy) over the regulation of coal mining activities within its borders rather than be subjected to federal statutes. In order to achieve primacy, the General Assembly was required to amend pre-existing Pennsylvania law to assure that its laws could meet minimum national standards set forth in the Federal Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. §§ 1201–1328 and various regulations promulgated by the Federal Office of Surface Mining, Reclamation and Enforcement. Prior to 1980, the surface effects of bituminous underground coal mining activities were regulated primarily by what is commonly referred to as The Clean Streams Law, Act of June 22, 1937, P.L.1987, *as amended,* 35 P.S. §§ 691.1–691.1001, and the Bituminous Mine Subsidence and Land Conservation Act, (commonly referred to as the 1966 Act), Act of April 27, 1966, P.L. 31, *as amended,* 52 P.S. §§ 1406.1–1406.21. However, before 1980, there were no regulations implementing the 1966 Act. After the 1980 Amendments, regulations were codified in 25 Pa.Code §§ 86.1–86.242, 89.1–89.173.

**3.** While the permits contained a multitude of standard terms and conditions, the Operators contend that the following fifteen standard conditions found in the permits were actually regulations which should have been promulgated:

    a. Conditions B.1.n and B.1.*o* defining the terms "subsidence" and "support area";

    b. Conditions B.2.c(1)(d)–(f) and B.2.d(2)(a) relating to reporting of changes in mining activity which may result in noncompliance with the permit;

    c. Condition B.2.d. relating to notification of toxic substances;

    d. Condition B.2.g. relating to maintenance of records and submission of information;

    e. Condition B.5.d. relating to possible enforcement actions;

    f. Condition B.5.k. relating to acceptance of permit conditions;

eral applicability and future effect and, as such, were invalid because they had not been promulgated in accordance with Sections 201 and 202 of the Commonwealth Documents Law,[4] Act of July 31, 1968, P.L. 769, *as amended*, 45 P.S. §§ 1201 and 1202,[5] which require notice and comment before adoption of a rule. The DER contended that it had the authority to apply the standard conditions as

> g. Condition C.1. relating to the filing of copies of the subsidence control portion of the permit and all supporting maps;
> h. Conditions C.4. and C.5. relating to periodic mapping requirements ("six month maps");
> i. Condition C.6. relating to the mapping of support areas beneath oil and gas wells; and
> j. Condition C.8. relating to notification requirements for owners of surface land, political subdivisions and residents of structures overlying the mining activity.

4. Section 101 of the Commonwealth Documents Law, 45 P.S. § 1101, which constituted the short title to the Commonwealth Documents Law, was repealed by the Act of July 9, 1968, P.L. 769, 877. No new title has been added to amend that Act. However, for purposes of this opinion, we will continue to refer to Sections 1101–1611 as sections falling under the Commonwealth Documents Law.

5. Section 201 of the Commonwealth Documents Law, 45 P.S. § 1201, provides the following:

> Except as provided in section 204, an agency shall give, in the manner provided in section 405 (relating to additional contents of temporary supplements) public notice of its intention to promulgate, amend, or repeal any administrative regulation. Such notice shall include:
> (1) The text of the proposed administrative regulation, except any portions thereof omitted pursuant to section 407 (relating to matter not required to be published), prepared in such a manner as to indicate the words to be added or deleted from the presently effective text thereof if any.
> (2) A statement of the statutory or other authority under which the administrative regulation or change therein is proposed to be promulgated.
> (3) A brief explanation of the proposed administrative regulation or change therein.
> (4) A request for written comments by any interested person concerning the proposed administrative regulation or change therein.
> (5) Any other statement required by law.

Section 202 of the Commonwealth Documents Law, 45 P.S. § 1202, provides in pertinent part the following:

> Before taking action upon any administrative regulation or change therein, the agency shall review and consider any written comments

an official policy or as a legitimate exercise of the DER's adjudicatory power. The DER filed a Motion to Limit Issues, which, after conference, the parties agreed could be treated as a Motion for Partial Summary Judgment.

The EHB consolidated the forty-six appeals to address the common issue of whether the standard conditions constituted regulations and were invalid because they had not been promulgated in accordance with the Commonwealth Documents Law. On January 22, 1990, the EHB issued an opinion and order declaring the fifteen standard conditions in question in the permits invalid. The EHB found that these standard conditions, which established binding norms of general applicability and future effect, were regulations which should have been promulgated pursuant to the Commonwealth Documents Law.[6] The DER then filed the present appeal.

We must now decide whether the EHB erred in determining that the standard conditions in the permits are invalid because they constitute regulations and were not promulgated in accordance with the Commonwealth Documents Law, or whether the standard conditions are statements of policy which do not require promulgation. If we find that these conditions are regulations which were not promulgated, we must then determine whether the DER had statutory authority to attach the conditions to the permits.

## I.

The process by which regulations are issued provides an important safeguard for potentially affected parties against

submitted pursuant to section 201 and may hold such public hearings as seem appropriate.

**6.** The Operators also requested the EHB to determine whether the standard conditions were beyond the DER's statutory authority because they were not necessary for the Commonwealth to maintain "primacy" in regulating surface mining of coal, and whether certain standard conditions in the permits were unconstitutionally vague. Because the EHB determined that the conditions were regulations which had not been promulgated and were invalid for that reason, the EHB did not address these other issues. Neither party has raised either of these issues on appeal.

the unwise or improper exercise of discretionary administrative power. This process, which includes public notice of a proposed rule, making a request for written comments by any interested party, giving due consideration to such comments, and holding hearings as appropriate, affords the affected parties a democratic process for participation in the formulation of standards which govern their conduct and increases the likelihood of administrative responsiveness to their needs and concerns. Moreover, it gives the administrative agency facts and information relevant to the proposed rule, as well as opens up the agency to alternatives, detrimental effects, criticism and advice, thereby contributing to the soundness of the proposed regulation. *See National Petroleum Refiners Association v. Federal Trade Commission,* 482 F.2d 672, 683 (D.C.Cir.1973); *Texaco, Inc. v. Federal Power Commission,* 412 F.2d 740, 744 (3d Cir.1969). Not only is sound regulation promoted by this process, but it increases the likelihood of administrative responsiveness to the needs and concerns of those affected, because it promotes acquiescence in the result, even when the objections of those affected remain the same as to substance. *Jean v. Nelson,* 711 F.2d 1455, 1481 (11th Cir.1983).

Statements of policy, however, need not be subject to notice and comment because, presumably, they only provide guidance by which administrative agency personnel carry out their power delegated to them by the General Assembly. Statements of policy are generally considered less structured and significant and, for those reasons, effect the agency belief that a policy is not sufficiently developed to be issued as a regulation.

The courts, both state and federal, however, have had much difficulty in determining when an agency pronouncement is a "regulation" or a "statement of policy." The federal courts have been more vocal about this difficulty because, while Section 553(b) of the Administrative Procedure Act (APA), 5 U.S.C. § 553(b), requires notice and comment for regulations but not for statements of policy,

Section 551 of the APA, § 551, fails to provide a definition or guidance as to what constitutes a statement of policy. Addressing this problem, the Second Circuit in *Noel v. Chapman*, 508 F.2d 1023, 1030 (2d Cir.1975), *cert denied*, 423 U.S. 824, 96 S.Ct. 37, 46 L.Ed.2d 40 (1975), stated, "the distinction between a statement of policy and a regulation is enshrouded in considerable smog." More colorfully, the Eleventh Circuit in *Jean v. Nelson*, 711 F.2d 1455, 1488 (11th Cir.1983), stated, "analyzing a rule within the general policy exception is akin to wandering lost in the Serbonian Bog." Despairingly, Kenneth Davis, in his treatise on administrative law, states, "The law on this subject is obviously unsatisfactory, but no one steps forward to remedy its deficiencies. Everyone fails, Congress, courts, agencies, treatise writers." K. Davis, *Administrative Law of The Eighties, 1989 Supplement to Administrative Law Treatise*, § 7:5, p. 235.

Pennsylvania, at first glance, appeared to have avoided the "smog," "bog" and "despair" encountered by the federal courts by defining both statements of policy and regulations in the Commonwealth Documents Law. Section 102(13) of the Law, 45 P.S. § 1102(13), defines statement of policy as follows:

> "Statement of policy" means any document, except an adjudication or a regulation, promulgated by an agency which sets forth substantive or procedural personal or property rights, privileges, immunities, duties, liabilities or obligations of the public or any part thereof, and includes, without limiting the generality of the foregoing, any document interpreting or implementing any act of Assembly enforced or administered by such agency.

Because the definition is so substantive and expansive, any pronouncement of an agency would appear to fall within its ambit, including the standard conditions at issue here.

On the other hand, a regulation is not defined substantively by what it is, but rather procedurally—by how it is

issued.[7]  Section 102(12) of the Commonwealth Documents Law, 45 P.S. § 1102(12), defines regulation as follows:

> "Regulation" means any rule or regulation, or order in the nature of a rule or regulation, promulgated by an agency under statutory authority in the administration of any statute administered by or relating to the agency, or prescribing the practice or procedure before such agency.

It would appear that under the Commonwealth Documents Law, the only difference between a regulation and statement of policy is how the agency pronouncement is issued.  A statement of policy is transformed into a regulation by undergoing notice and comment pursuant to Section 201 of the Commonwealth Documents Law, 45 P.S. § 1201. If an agency believes that an action it desires to take is so well thought out or that a statement of policy has worked so well, and the agency does not desire to have that policy repeatedly adjudicated, the agency can issue it as a regulation and invite notice and comment.

Apparently harkening back to the purpose behind the formal notice and comment procedure, which is to allow persons who may be affected to have input and not be dependent on others protecting their rights piecemeal through the administrative agency process, our Supreme Court has taken an alternative approach.  In *Pennsylvania Human Relations Commission v. Norristown Area School*, 473 Pa. 334, 374 A.2d 671 (1977), our Supreme Court concluded that the General Assembly did not intend for the agency to have sole discretion in determining when

---

**7.**  To the contrary, Section 551(4) of the APA, 5 U.S.C. § 551(4) defines "rule," which is the APA's term for a "regulation," substantively: (4) "Rule" means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing.

a statement of policy would be settled enough to become a regulation.[8]

To preclude an agency from avoiding notice and comment, our Supreme Court in *Norristown* adopted the federal rationale, commonly known as the "binding norm test," to determine when a statement of policy is a regulation under the APA.[9] Relying specifically on the reasoning of the Court of Appeals in the District of Columbia in *Pacific Gas & Electric Co. v. FPC*, 164 U.S.App.D.C. 371, 506 F.2d 33 (D.C.Cir.1974), our Supreme Court stated:

> [A]n agency may establish binding policy through rule-making procedures by which it promulgates substantive rules or through adjudications which constitute binding precedents. A general statement of policy is the outcome of neither a rulemaking nor an adjudication; it is neither a rule nor a precedent, but is *merely an announcement* to the public of the policy which the agency hopes to implement in future rulemakings or adjudications. *A general statement of policy, like a press release, presages an upcoming rulemaking or announces the course which the agency intends to follow in future adjudications.*
>
> The critical distinction between a substantive rule and a general statement of policy is the different practical effect that these two types of pronouncements have in subsequent administrative proceedings ... A properly adopted substantive rule establishes a standard of conduct *which has the force of law* ... The underlying policy embodied in the rule is not generally subject to challenge before the agency.

8. In *Norristown,* the issue was whether the Human Relations Commission's Recommended Desegregation Guidelines for Public Schools were statements of policy, which could be adjudicated on a case-by-case basis, or regulations, which had to be promulgated.

9. Our Supreme Court adopted this approach, even though the federal APA does not define statement of policy and the Commonwealth Documents Law does, and the Commonwealth Documents Law defines statement of policy substantially the way the APA would define a rule.

A general statement of policy, on the other hand, *does not establish a 'binding norm'* ... A policy statement announces the agency's *tentative intentions for the future*. When the agency applies the policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued. (Emphasis added.)

"Binding norm" means that the agency is bound by the statement until the agency repeals it, and if the statement is binding on the agency, it is a regulation. Additionally, in determining whether an agency action is a regulation or a statement of policy, one must look to the extent to which the challenged pronouncement leaves the agency free to exercise discretion to follow or not follow the announced policy in an individual case. *Mada–Luna v. Fitzpatrick*, 813 F.2d 1006, 1013 (9th Cir.1987).

▮ Relying on the binding norm test established in *Norristown*, the DER argues that the standard conditions are policy statements which do not require promulgation, because they do not have the force of law.[10] However, via their standard conditions, the DER sets forth a comprehensive system regarding mining operations which provides conditions precedent in order to mine coal in Pennsylvania. These conditions, covering the areas of subsidence control, mapping requirements and reporting requirements, have a significant impact on the Coal Mine Operators. For example, Condition C.4. prevents the permittees from conducting any underground mining activity until the activity is depicted on a six-month mining map, the DER has determined that the activity depicted on. the map implements the subsidence control plan, and the map is filed with the Recorder of Deeds for each county in which mining is projected. Similarly, Condition C.6. prevents the Coal Mine Operators

10. The Coal Mine Operators contend that the DER is precluded from making this argument on appeal because it did not raise the issue below before the EHB. Issues raised for the first time on appeal are normally waived, *Newlin Corporation v. Department of Environmental Resources*, 134 Pa.Commonwealth Ct. 396, 579 A.2d 996 (1990). The EHB, however, addressed this issue in its opinion.

from conducting mining within 150 feet of an oil or gas well until the pillar plan is depicted on the six-month mining map, the District Office approves the map, and the Bureau of Oil and Gas Management has approved the plan by issuing a pillar permit.

Applying the binding norm test to these conditions, the DER is attempting to implement a uniform state-wide policy for certain aspects of mine operations. Inherent in a state-wide policy is that the regulations will necessarily be binding on the agency, and none of the agency's personnel will have any discretion to vary those terms and conditions. In the instant case, because the DER ministerially applied the conditions to all forty-six permits and the regulations were generic in nature and not at all related to facts, the DER intended the conditions to be binding on the agency and none of its employees to have any discretion in applying the conditions to any individual case. Consequently, we find that the standard conditions meet the binding norm test and are regulations, and the DER failed to promulgate the standard conditions in accordance with the Commonwealth Documents Law.

## II.

The DER argues in the alternative that even if the standard conditions were regulations which it failed to promulgate, the DER had adjudicatory power to implement standard conditions to effectuate the intent of the mining statutes.[11] The DER relies on the holding in *Lopata v.*

11. The DER also alleges that pursuant to the Commonwealth Documents Law, it may establish standards of general application and future effect by either regulations *or* statements of policy. Specifically, the DER contends that the DER's permit form, which sets forth the standard conditions which may be applied as appropriate in mining permits, is a statement of policy as defined by Section 102(13) of the Commonwealth Documents Law, 45 P.S. § 1102(13). The DER explains that in regulations promulgated by the Joint Committee on Documents, pursuant to the Commonwealth Documents Law, statements of policy are further defined to include the definition of "guideline." Because a "guideline" is defined under 1 Pa.Code § 1.4 as a document which announces the policy an agency intends to

*Unemployment Compensation Board of Review,* 507 Pa. 570, 493 A.2d 657 (1985), for the proposition that a two-step method is required when it is claimed that an agency adjudication is based upon a regulation which was not promulgated.[12]  The DER contends that under *Lopata,* we are first required to determine whether the challenged agency adjudication was based upon a statement of policy which should have been adopted as a regulation.  Then, we must determine whether the agency's decision should be upheld as a valid exercise of its adjudicative function.  That question turns on an issue of statutory construction.

However, in *Lopata, Poola* and *Orbera,* the regulations in question dealt with the way in which the Unemployment Compensation Board interpreted a statute.  If the agency interpretation of a statute is incorrect, it is an appropriate function of the adjudicatory process to provide the correct interpretation.  In this case though, the DER is not interpreting a statute, but rather, is setting forth supplemental provisions to an existing statute.  The attachment of standard conditions to permits is not an interpretive function, but instead, a regulatory one, and the adjudicative process would be inappropriate for announcing agency policy.  Therefore, the DER's argument is without merit.

The DER also argues that it had statutory authority to apply standard conditions to permittees in similar situations, because standard conditions are authorized by statute

implement in future rulemakings, standard conditions having future effect may be made through statements of policy as well as regulations.

While the DER may be correct in stating that it can announce the conditions it intends to implement in future rulemakings via "statements of policy," the standard conditions found on its permit form were not conditions that were applied *as appropriate* in granting the permits, because they were ministerially attached to each of the permits and were not statements of policy because they required compliance before the application was approved.

**12.** The DER also cites *Poola v. Unemployment Compensation Board of Review,* 520 Pa. 562, 555 A.2d 97 (1989), and *Orbera v. Unemployment Compensation Board of Review,* 91 Pa.Commonwealth Ct. 438, 497 A.2d 693 (1985), for the same proposition.

pursuant to Section 5 of the 1966 Act, 52 P.S. § 1406.5;[13] Sections 307 and 315 of The Clean Streams Law, 35 P.S. §§ 691.307 and 691.315[14]; and Sections 18.4 and 18.5 of the Surface Mining Conservation and Reclamation Act, Act of May 31, 1945, P.L. 1198, *as amended*, 52 P.S. §§ 1396.22 and 1396.23.[15] Additionally, the DER contends that 25 Pa.Code §§ 86.41 and 86.42 give the DER the authority to attach standard conditions to permits.[16]

**13.** Section 5 of the Act, 52 P.S. § 1406.5, provides in part that all permits issued under this act shall contain such terms and shall be issued for such duration as the department may prescribe.

**14.** Section 307(c) of The Clean Streams Law, 35 P.S. § 691.307(c), provides that a discharge of industrial wastes without a permit or contrary to the terms and conditions of a permit or contrary to the rules and regulations of the department, is hereby declared to be a nuisance.

Section 315(a) of The Clean Streams Law, 35 P.S. § 691.315(a), provides in part that the operation of any mine or the allowing of any discharge without a permit or contrary to the terms or conditions of a permit or contrary to the rules and regulations of the department, is hereby declared to be a nuisance.

**15.** Section 18.4 of the Surface Mining Conservation and Reclamation Act, 52 P.S. § 1396.22 provides in part that in addition to proceeding under any other remedy available at law or in equity for a violation of a provision of this act, rule, regulation, order of the department, or a condition of any permit issued pursuant to this act, the department may assess a civil penalty upon a person or municipality for such violation.

Section 18.5 of the Surface Mining Conservation and Reclamation Act, 52 P.S. § 1396.23 provides in part that any person or municipality who violates any provision of this act, any rule or regulation of the department, any order of the department, or any condition of any permit issued pursuant to this act, is guilty of a summary offense and upon conviction, such person or municipality shall be subject to a fine of not less than one hundred dollars ($100) nor more than ten thousand dollars ($10,000) for each separate offense, and, in the default of the payment of such fine, a person shall be imprisoned for a period of ninety (90) days.

**16.** 25 Pa.Code § 86.41 provides in part that each permit issued by the Department shall, at a minimum, ensure and contain the following conditions:

(1) Except to the extent that the Department otherwise directs in the permit that specific actions be taken, the permittee shall conduct coal mining activities as described in the approved application.

25 Pa.Code § 86.42 provides the following:

Each permit issued by the Department will ensure and contain specific conditions requiring that the:

While the statutes cited by the DER do provide the DER with the authority to attach terms and conditions to mining permits, and the Pennsylvania Code sections cited outline the types of conditions to be included in the permits, those sources do not give the DER the authority to mask regulations as standard conditions, nor relieve it from the obligation to promulgate those conditions when they are in the nature of regulations which are binding and have the force of law. Even though the DER believes that the conditions are generic in nature, and, therefore, will be permissible and apply to all of the operators, the DER overlooks the fact that even generic conditions may be found to be regulations if they, too, are binding and have the force of law. Because we have determined that the general conditions in question in the permits were regulations which should have been promulgated and were not, we find that the DER did not have the authority to apply the conditions to all of the permittees as a matter of policy.[17]

> (1) Permittee shall take all possible steps to prevent an adverse impact to the environment or public health and safety resulting from noncompliance with terms or conditions of the permit, including:
> (i) An accelerated or additional monitoring necessary to determine the nature and extent of noncompliance and the results of the noncompliance.
> (ii) Provide warning, as soon as possible after learning of the noncompliance, to a person whose health and safety is in imminent danger due to the noncompliance.
> (2) Permittee shall conduct the activities in accordance with measures specified in the permit as necessary to prevent environmental harm or harm to the health or safety of the public.

17. Additionally, the DER argues that the case of *Warren Sand & Gravel Co., Inc. v. Department of Environmental Resources*, 20 Pa.Commonwealth Ct. 186, 341 A.2d 556 (1975), supports the proposition that the DER has discretionary authority to place terms and conditions in permits based on its statutory and regulatory authority. While the DER obviously has the authority to place conditions in permits, we have determined in this case that simply having statutory and regulatory authority to place conditions in permits does not mean an agency may do so if those conditions are regulations which must first be promulgated. In this case, the standard conditions were regulations which required promulgation, but were not promulgated. Additionally, we note that *Warren Sand* was decided several years prior to *Norristown*, which is the leading case in this area. Because

Our scope of review is limited to determining whether the EHB committed constitutional violations, errors of law, or whether any necessary findings were unsupported by substantial evidence. *Pennsylvania Game Commission v. Department of Environmental Resources*, 97 Pa.Commonwealth Ct. 78, 509 A.2d 877 (1986). Because the standard conditions in the permits issued by the DER were, in fact, regulations, and were not promulgated pursuant to the Commonwealth Documents Law, and the DER did not have statutory authority to insert the standard conditions without first promulgating the conditions as regulations, we find that the EHB did not err in finding that the standard conditions were invalid. Accordingly, the decision of the EHB is affirmed.

## ORDER

AND NOW, this 10th day of May, 1991, the order of the Environmental Hearing Board, dated January 22, 1990, is affirmed.

*Norristown* set forth the binding norm test as the standard to be used in determining when an agency pronouncement is a regulation or a statement of policy, and *Warren Sand* did not utilize this standard, we find that the holding in *Warren Sand* has no application to the present case.