THE MID–ATLANTIC POWER
SUPPLY ASSOCIATION,
Petitioner,

v.

PENNSYLVANIA PUBLIC UTILITY
COMMISSION, Respondent.

Peco Energy Company, Petitioner,

v.

Pennsylvania Public Utility
Commission, Respondent.

Frank A. Salvatore, Petitioner,

v.

Pennsylvania Public Utility
Commission, Respondent.

Commonwealth Court of Pennsylvania.

Argued Dec. 8, 1999.
Decided Feb. 25, 2000.

Joseph A. Dworetzky, Philadelphia, for petitioner, Mid-Atlantic Power Supply Association. Anthony C. DeCusatis, Philadelphia, for petitioner, PECO Energy Co.

Andrew S. Tubbs, Harrisburg, for respondent.

Tanya McCloskey, Harrisburg, for intervenor, Office of Consumer Advocate.

Before DOYLE, President Judge, and COLINS, J., McGINLEY, J., PELLEGRINI, J., FRIEDMAN, J., KELLEY, J., LEADBETTER, J.

McGINLEY, Judge.

▮ PECO Energy Company (PECO), Mid–Atlantic Power Supply Association (MAPSA) and Frank A. Salvatore (Salvatore) (collectively, Petitioners), seek review of the Public Utility Commision's (PUC) order which, *inter alia*, promulgated procedures for full implementation of retail choice by consumers of electricity (customers).[1] This Court has consolidated these cases for review.[2]

On April 24, 1998, the PUC entered a tentative order that outlined a procedure whereby electric distribution companies (Distributors) enrolled customers into the Pennsylvania Electric Choice Program pursuant to the Electricity Generation

---

1. Briefs were also submitted by intervenors: Office of Consumer Advocate (OCA), PP & L, Inc. (PP & L), Shell Energy Services Co., L.L.C. (Shell), Industrial Energy Consumers of Pennsylvania (IECPA), PECO as cross-intervenor, and MAPSA as cross-intervenor. State Senator, Vincent J. Fumo (Fumo), has filed *amicus curiae* in support of PECO's position.

2. Because no brief or reproduced record was submitted by Salvatore, nor any step taken to perfect its petition for review, the petition for review of *Frank A. Salvatore v. Pennsylvania Public Utility Commission*, at No. 1701 C.D. 1999, is dismissed. Pa.R.A.P. No. 1511.

Customer Choice and Competition Act (Electric Choice Act), 66 Pa.C.S. §§ 2801–2812.[3]

On May 21, 1998, the PUC issued an order which provided for customer enrollment procedures for Distributors and electric generation suppliers (Suppliers) to "ensure an orderly transition to a competitive generation market." First Enrollment Order of the PUC, May 21, 1998 (First Enrollment Order); R.R. at 3a–40a. The First Enrollment Order set forth procedures to set a specific enrollment date, customer eligibility, methods of enrollment, enrollment cards, communications between Distributors and Suppliers, the selection of a supplier, and a voluntary participation election by the customer. This First Enrollment Order also required PECO to change certain provisions of its supplier tariffs consistent with the order. The First Enrollment Order was not appealed.

On March 19, 1999, the PUC issued a tentative order and solicited suggested procedures for Distributors and Suppliers during the transition to full customer choice for retail electric use. Second Enrollment Order of the PUC, March 19, 1999 (Second Enrollment Order); R.R. at 96a–107a. The Second Enrollment Order specified January 2, 2000, as the implementation date of the program, declared that all customers were eligible for participation and proposed a method to restrict dissemination of customer information. On May 13, 1999, a public meeting was conducted to resolve the final restructuring process, discuss amendments to the Second Enrollment Order and to regulate the release of certain information from customer enrollment cards.

On May 18, 1999, the PUC entered a final order which provided implementa-

tions and procedures for full retail choice, effective January 2, 2000, pursuant to the Electric Choice Act. Procedures Applicable to Electric Distribution Companies and Electric Generation Suppliers During Transition to Full Retail Competition, Final Order, May 18, 1999 (PUC's Final Order); PUC Brief at Appendix A.

The PUC's Final Order provided for notification to all customers of their respective eligibility, limited disclosure of and access to the identity of the consumers (load data), and set time frames for notice by Distributors to customers. The PUC determined that a 12 month history of demand was reasonable for the load data, and that October 8, 1999 was the last day for Distributors to submit eligibility lists, with implementation as soon as reasonable. The Final Order made all customers automatically eligible to choose an alternative Supplier from an available list and modified the enrollment process to allow direct access to full competition in the retail electric market while providing customers with the right to restrict release of confidential information. PUC's Final Order at 24–25.

The PUC concluded that:

> We are requiring that the notification packets [to customers] to include a prepaid postage form that customers may use to indicate their desire to restrict the release of certain data, which must be returned to the EDC [Distributors] by September 24, 1999, consistent with the resolution of customer disclosure issues in this Final Order. Moreover, in view of the importance of ensuring that customers are aware of the process that will be utilized to have information shared with EGS [Suppliers], the envelopes used for these mailings shall be clearly marked to indicate that a privacy release form is enclosed.

---

**3.** In 1996, the Electric Choice Act restructured the retail electric industry in Pennsylvania by mandating direct access to consumer/users and to establish open competition in a fair and orderly manner. 66 Pa.C.S. § 2802, § 2804(14). The PUC set up a frame-

work for all interested parties to participate. The PUC held evidentiary hearings, heard testimony from over thirty providers and public interest groups and subsequently scheduled a Phase-in Period for the new system.

. . . .

Although we desire to see the broadest possible amount of customer information made available to EGS [Suppliers], we continue to be concerned about the privacy of customers, particularly with respect to the release of telephone numbers, which often might be unlisted or protected for various reasons. We believe that access to a customer's name, address, account number, rate class, and load data is absolutely necessary for a supplier to have the ability to develop specific pricing offers and to have meaningful opportunity to attract customers. Therefore, we conclude that subject to the ability of customers to prevent the disclosure of 1) load data, or 2) all information, EDC [Distributors] should release to licensed EGS [Suppliers] the names, billing address, service address, rate class, rate sub-class (if available), account number and load data for all eligible customers. Customers shall have the ability to restrict the release of either their load data or all information by placing a notation in the correct check-off box that clearly indicates what information is being restricted. The forms used for these purposes shall also advise customers that EGS [Suppliers] are required to maintain the confidentiality of all data that is provided to them. Further the forms shall note the potential benefits of disclosing this information to EGS [Suppliers] in terms of the offers for services that might be available to customers.

. . . .

We are committed to affording customers ample time for reviewing the eligibility notification packets and making decisions about what information, if any, they wish to restrict. Nevertheless, since we have decided to give customers the option of precluding the release of all information, the posting of any eligibility lists must necessarily await the return of these forms. Since we have established September 1, 1999 as the date by which all packets must be mailed, we conclude that the forms must be returned by September 24, 1999 so that eligibility lists can be made available to EGS [Suppliers] no later than October 8, 1999. As to any future requirement for the updating of these lists, we find that this issue should be discussed by the Phase In Committee or addressed at any technical conference scheduled at this docket for resolution at a later time.

. . . .

Therefore, it is ordered:

1. That electric distribution companies (EDC) [Distributors] and electric generation suppliers (EGS) [Suppliers] shall comply with the procedures applicable to the transition to and implementation of full retail choice in January 2000, as set forth in this Final Order.

PUC's Final Order, at 12–13, 23–25, 31–32, and 36. Petitioners seek review of this order.[4]

■ The critical issues for our review are whether the PUC reasonably exercised its discretion in developing procedures for the full implementation of customer choice and whether the release of customer lists to providers violated disclosure laws.[5]

---

4. On August 19, 1999, this Court's Honorable Warren G. Morgan, Senior Judge, denied PECO's application for stay or supersedeas of PUC's Final Order.

5. Our review is limited to a determination of whether constitutional rights have been violated, if an error of law has been committed, or whether the findings of the PUC are supported by substantial evidence. 2 Pa.C.S. § 704; *South River Power Partners, L.P. v.*

*PUC,* 696 A.2d 926 (Pa.Cmwlth.1997). This Court must defer to the discretion of the PUC when the PUC interprets its enabling statute unless the decision bears no reasonable relationship to the regulatory purpose of the legislation. *Popowsky v. Pennsylvania Public Utility Commission,* 669 A.2d 1029 (Pa.Cmwlth. 1995), *appeal granted in part,* 545 Pa. 657, 680 A.2d 1165 (1996), *reversed in part,* 550 Pa. 449, 706 A.2d 1197 (1997).

PECO contends that the PUC failed to protect the privacy rights of its customers and that the PUC's Final Order violated Section 1201 of the frequently referred to "Commonwealth Documents Law"[6] and the Regulatory Review Act[7] as it pertains to PECO.

MAPSA asserts that the PUC abused its discretion because it failed to require Distributors to grant Suppliers complete access to all customer information for promotional purposes, and contends that PECO, and State Senators Salvatore and Fumo lack standing.[8] We will first review the issues raised by MAPSA.

MAPSA cites no authority to support the position that the PUC abused its discretion by not making all customer information fully available to Suppliers. Mere bald assertions, personal opinions or perceptions do not constitute evidence. *Pennsylvania Bureau of Corrections v. City of Pittsburgh*, 516 Pa. 75, 532 A.2d 12 (1987). MAPSA failed to establish any abuse of discretion.[9]

Next, MAPSA contends that PECO, Salvatore and Fumo lack standing. We agree.[10] PECO contends that "notice and opportunity to be heard were not provided to customers" and that customers' fundamental right to non-disclosure is substantially diminished by the PUC's Final Order. Without establishing that PECO sustained direct, immediate and substantial harm by the PUC's Final Order, PECO fails to qualify as a 'substantially interested party' who is aggrieved sufficiently to have standing in this matter. 2 Pa.C.S. § 702; *William Penn Parking Garage, Inc. v. City of Pittsburgh*, 464 Pa. 168, 346 A.2d 269 (1975). PECO does not assert that the disclosure will spur competition and cause pecuniary harm to PECO. Rather PECO allegedly attacks the PUC's Final Order on the ground that its customers' rights were not fully respected. We are unpersuaded. PECO does not represent the interests of its ratepayers. A party may not claim standing to vindicate the rights of a third party who has the opportunity be heard. *Pennsylvania Dental Assoc. v. Commonwealth of Pennsylvania, Department of Health*, 75 Pa.Cmwlth. 7, 461 A.2d 329 (1983). Additionally, Section 902–A of the Administrative Code[11] statutorily provided for the OCA to represent the interests of consumers before the PUC, and the OCA, as intervenor, submitted its brief in support of the PUC's Final Order. PECO was not aggrieved by the order to release specified customer information to all licensed suppliers of electricity and therefore lacks standing.

However, PECO does raise a justiciable question with respect to whether the PUC violated the Commonwealth Documents Law and the Regulatory Review Act.

PECO asserts that the PUC's Final Order is a regulation as defined by the Regulatory Review Act, and that Section 1201 of the Commonwealth Docu-

---

6. Act of July 31, 1968, P.L. 769, *as amended*, 45 P.S. § 1201.

7. Act of June 25, 1982, P.L. 633, *reenacted* by Act of February 21, 1986, P.L. 47, and amended by Act of June 25, 1997, P.L. 252, 71 P.S. §§ 745.1–745.15.

8. This Court has already dismissed the petition of Salvatore, and because Fumo proceeds solely as *amicus curiae*, in support of PECO, he is not a party to this action and has no right to institute any proceedings herein. *See In re Petition for Referendum to Amend Home Rule Charter of City of Pittsburgh*, 69 Pa. Cmwlth. 292, 450 A.2d 802 (1982).

9. We note that MAPSA filed a second brief, as intervenor in support of the PUC's Final Order, wherein it raises the issue of lack of standing as to PECO, Salvatore and Fumo and asserts that the PUC's Final Order was a reasonable exercise of discretion and reasonably protected customer interests.

10. Because we have already disposed of this issue with respect to Salvatore and Fumo, we will confine our analysis to PECO.

11. Act of April 9, 1929, P.L. 177, *as amended* by Act of October 15, 1980, P.L. 950, 71 P.S. § 309–2.

ments Law, 45 P.S. § 1201, required an administrative agency to provide public notice of its intention to promulgate a regulation and to publish the regulation in the Pennsylvania Bulletin. The Regulatory Review Act provides for ultimate review of a commission's regulation by the General Assembly. Section 545.3 of the Regulatory Review Act, 71 P.S. § 745.3, defines a "regulation" as:

> Any rule or regulation, or order in the nature of a rule or regulation, promulgated by an agency under statutory authority in the administration of any statute administered by or relating to the agency or amending, revising or otherwise altering the terms and provisions of an existing regulation, or proscribing the practice or procedure before such agency.

Section 2802(12) of the Electric Choice Act provides:

> The purpose of this Chapter is to modify existing legislation and regulations and to establish standards and procedures in order to create direct access by retail customers to the competitive market for the generation of electricity while maintaining the safety and reliability of the electric system for all parties.

66 Pa.C.S. § 2802(12). The Electric Choice Act authorizes the PUC to establish time limitations for the transition to and phase-in of direct access to competitive electric generation, 66 Pa.C.S. § 2804(11), and directs the PUC to "provide guidelines for retail access pilot programs by order." 66 Pa.C.S. § 2806(g). This Court has determined that the General Assembly's directive to promulgate guidelines to implement provisions of legislation does not constitute a regulation, but instead is a policy statement not subject to the regulatory review process. *Chimenti v. Pennsylvania Department of Corrections,* 720 A.2d 205 (Pa.Cmwlth.1998). A policy statement does not establish a binding norm but announces the agency's tentative future intentions, and provides the agency with the flexibility to follow the

announced policy or modify it if the circumstances are appropriate. *Department of Environmental Resources v. Rushton Mining Co.,* 139 Pa.Cmwlth. 648, 591 A.2d 1168, *petition for allowance denied,* 529 Pa. 626, 600 A.2d 541 (1991). Additionally, the PUC's Final Order sets forth a procedural policy which implemented the "... fair and orderly transition" mandate of the Electric Choice Act, 66 Pa.C.S. § 2802(13). This policy did not fall within the parameters of the Commonwealth Documents Law or the Regulatory Review Act. *See Uniontown Area School District v. Pennsylvania Human Relations Commission,* 455 Pa. 52, 313 A.2d 156 (1973).

█ In order to comply with the terms of the Electric Choice Act it was necessary that the PUC followed the Electric Choice Act without violating a customer's basic rights. The PUC's Final Order addressed these issues and determined that the customer should enjoy the option whether to participate. This Court has held that absent proof of fraud, bad faith or abuse of discretion, a decision of the PUC will stand. *South River Partners.*

The PUC's Final Order enabled the customer to restrict any information from being divulged to Suppliers, at the same time it afforded the customer the opportunity to participate in the program. The PUC properly exercised its discretion and preserved the delicate balance between a viable and competitive marketplace and customer privacy.

Accordingly, we affirm.

### ORDER

AND NOW, this 25th day of February, 2000, the order of the Pennsylvania Public Utility Commission at the above captioned numbers is affirmed, and the petition for review at No. 1701 C.D.1999 is dismissed.

Judge COLINS and Judge FRIEDMAN concur in the result only.