**BALDWIN HEALTH CENTER,**
**Petitioner,**

v.

**DEPARTMENT OF PUBLIC**
**WELFARE, Respondent.**

Commonwealth Court of Pennsylvania.

Argued April 13, 2000.
Decided June 27, 2000.

---

Jules S. Henshell, Harrisburg, for petitioner.

Jason W. Manne, Pittsburgh, for respondent.

Before SMITH, Judge, KELLEY, Judge, McCLOSKEY, Senior Judge.

SMITH, Judge.

Baldwin Health Center (Baldwin) appeals from a June 24, 1999 order of the Director of the Department of Public Welfare (DPW), Bureau of Hearings and Appeals (Bureau) that adopted an Attorney Examiner's (Examiner) recommendation to deny Baldwin's appeal of various DPW actions related to calculating Baldwin's reimbursement for providing long-term care to eligible medical assistance (MA) recipients. Baldwin requests that the Court determine whether the Bureau erred in concluding that Baldwin was not entitled to reimbursement for depreciation and interest expenses under DPW's criteria for waiver of the moratorium on depreciation and interest imposed under 55 Pa.Code § 1181.259(r) and whether the Bureau erred in concluding that DPW should not be equitably estopped from denying Baldwin's waiver request.

I

As the administering agency of Pennsylvania's Medicaid plan, DPW reimburses skilled nursing and intermediate care facilities for services provided to MA recipients. The methods and standards for determining these reimbursement rates are detailed in the Manual for Allowable Cost Reimbursement for Skilled Nursing and Intermediate Care Facilities (Manual), 55 Pa.Code §§ 1181.201–1181.274. In 1983,

DPW amended the Manual to discourage the construction of new long-term care facilities. The amendment placed a moratorium on reimbursement for the depreciation and interest components of the per diem reimbursement rate [1] for new or additional beds. 55 Pa.Code § 1181.259(r). DPW occasionally waived the moratorium for specific facilities between 1983 and 1991, but such waivers were extremely rare, *see* Notes of Testimony (N.T.), June 8, 1995, p. 48, and DPW never promulgated any regulations setting forth the requirements for obtaining such a waiver.

Baldwin is a 200–bed facility located in Allegheny County which opened in October 1987. On December 7, 1987, Baldwin forwarded a letter to John White, then Secretary of the Department, requesting a moratorium waiver. Secretary White denied the request in a January 27, 1988 letter. He also informed Baldwin that DPW considered waiver requests on a case-by-case basis, and he identified the following criteria, meant to serve as guidelines only, that the Department was then considering for approval of a waiver:

1. The nursing home should be located in an area where there is a need for additional nursing home beds.
2. The county should have a pre-admission assessment program.
3. The facility must serve a large number of medical assistance patients.
4. The county government should endorse the waiver request.
5. The project should be approved by the Department of Health and local planning agencies.

Secretary White advised Baldwin that it had to increase its current projections of 30 to 40 percent MA occupancy to at least 60 percent and that Baldwin needed to submit a letter directly from the County Commissioners endorsing the waiver request. The Secretary encouraged Baldwin to resubmit its waiver request if it could resolve those two problems.

At Baldwin's request, then Chairman Tom Foerster of the Allegheny County Commissioners forwarded a letter on March 28, 1988 to Secretary White, which recommended that DPW consider granting the waiver. However, no other Commissioner endorsed the letter, and it contained no reference to a resolution endorsed by the Commissioners. Furthermore, the Office of the Chief Clerk for Allegheny County has no record of such a resolution. Baldwin also began to take steps that increased its percentage of MA occupancy. Baldwin temporarily attained an MA occupancy rate in excess of 60 percent around February 1989, but it had an MA occupancy rate of only 52.97 percent for that total fiscal year.

Between February 1988 and March 1989, Baldwin's attorney communicated by telephone and in writing with DPW Chief Counsel John Kane. Baldwin was aware that Mr. Kane lacked the authority to grant or deny moratorium waivers. On February 16, 1989, Baldwin advised Mr. Kane by telephone and in writing that it had satisfied all of the existing waiver criteria and that it had a medical assistance occupancy rate greater than 60 percent. DPW did not respond and at no time agreed that Baldwin had met all of the criteria for receiving a waiver. The following month, DPW's Budget Secretary issued a draft memorandum which recommended an additional criterion for waiver qualification, but DPW never notified Baldwin or other pending waiver appli-

---

1. The reimbursement is based upon a per diem rate, which is calculated to reimburse facilities for their "allowable net operating costs, plus allowable depreciation and interest on capital indebtedness." 55 Pa.Code § 1181.211(a). Payments are made on an interim basis throughout the year subject to an audit at the end of each fiscal year that determines the final allowable costs, rates and payment amounts. The moratorium did not affect the per diem reimbursement rate for existing beds or for replacement beds. 55 Pa.Code § 1181.259(r)(3); *see also Wilmac Corp. v. Bowen,* 811 F.2d 809 (3d Cir.1987) (discussing DPW's moratorium on depreciation and interest reimbursement).

cants of this additional criterion being considered by the department. DPW ceased granting waivers in 1991 due to pending federal litigation and the absence of any appropriation from the state legislature to support the waivers.

Between July 12, 1990 and September 28, 1994, Baldwin filed timely appeals of DPW's audit findings and examination of Baldwin's cost reports for fiscal periods from July 1, 1989 through June 30, 1993. Baldwin also appealed the interim per diem rates that DPW set for skilled nursing and intermediate care effective May 1, 1990, July 1, 1990, May 1, 1991, January 1, 1992, February 1, 1992 and July 1, 1995. These various appeals were consolidated, and Baldwin argued before the Examiner that DPW's actions were erroneous because Baldwin was entitled to reimbursement for depreciation and interest expenses pursuant to a moratorium waiver. Baldwin contended that DPW should be estopped from denying a waiver to it.

■ The Examiner concluded that DPW initially denied the waiver request for the reasons stated in the Secretary's January 1988 letter. Thereafter, DPW and Baldwin made honest attempts to arrange the granting of the waiver request, but these attempts were derailed because DPW's budgetary constraints precluded the granting of additional waiver requests. The Examiner also concluded that DPW had a duty to inform waiver applicants of the change in the criteria but that Baldwin failed to show any detriment. The Examiner found that Baldwin incurred financial hardship as a result of DPW's decision not to grant the waiver, but the Examiner determined that the hardship was not significant or catastrophic. The Bureau director adopted the recommendation and denied Baldwin's request.[2]

## II

■ As an initial matter, DPW contends that Baldwin is barred from challenging DPW's refusal to grant its waiver request because it failed to file a timely appeal from the Secretary's January 1988 letter of denial. The Examiner found that the Secretary denied Baldwin's waiver request in the 1988 letter. However, Secretary White also encouraged Baldwin to resubmit its waiver request if Baldwin could resolve the identified problems. Thereafter, DPW representatives continued to work with Baldwin in an attempt to arrange the granting of the waiver request, and the Examiner found that Mr. Kane informed Baldwin that its request was still pending in February 1989. Baldwin therefore is not barred from raising the issue in the current auditing and interim cost report appeals.

■ Baldwin first contends that it is entitled to a moratorium waiver for the years in question because it met the moratorium waiver criteria expressed in the Secretary's January 1988 letter. Baldwin argues that the criteria stated in the letter were "binding norms" which bound DPW to grant a moratorium waiver when the criteria were satisfied and that it was entitled to notice when DPW changed the criteria. DPW responds that the criteria were only guidelines for providers, that Baldwin was not entitled to notice when the guidelines changed and that, in any event, Baldwin never satisfied the criteria.

Baldwin's facilities were constructed after DPW imposed the moratorium on reimbursement for depreciation and interest expenses, and the owners of Baldwin were aware of the moratorium when they constructed the facilities. DPW has not published any regulations that might entitle any provider to a waiver of that moratorium. Nevertheless, Baldwin argues that the criteria specified in the Secretary's

2. The Court's review of the Bureau's order is limited to determining whether the Bureau's adjudication was in accordance with the law, whether the findings of fact were supported by substantial evidence and whether constitutional rights have been violated. *Varner v. Department of Public Welfare*, 558 Pa. 271, 736 A.2d 596 (1999).

January 1988 letter should be accorded the same effect as published and formally adopted regulations. Baldwin relies upon *Pennsylvania Human Relations Commission v. Norristown Area School Dist.,* 473 Pa. 334, 374 A.2d 671 (1977), *Department of Environmental Resources v. Rushton Mining Co.,* 139 Pa.Cmwlth. 648, 591 A.2d 1168 (1991), and *Elkin v. Department of Public Welfare,* 53 Pa.Cmwlth. 554, 419 A.2d 202 (1980), to support this proposition.

In *Norristown Area School Dist.,* the Pennsylvania Supreme Court considered whether the Human Relations Commission's definition of racial segregation was invalid because it had not been published in accordance with the applicable laws for promulgating a binding administrative regulation. The Commission used the definition only as guidance in its case-by-case adjudications. The Supreme Court determined that the definition was a general statement of policy not subject to the publication requirements of binding regulations. The Supreme Court found nothing improper in the Commission's procedure of disseminating the definition to school districts, making recommendations and then proceeding by adjudication when conciliation failed.

The Supreme Court adopted the rationale of *Pacific Gas & Electric Co. v. Federal Power Commission,* 506 F.2d 33 (D.C.Cir.1974), where the Court of Appeals explained the distinction between substantive rules and general statements of policy:

> The critical distinction between a substantive rule and a general statement of policy is the different practical effect that these two types of pronouncements have in subsequent administrative proceedings. A properly adopted substantive rule establishes a standard of conduct which has the force of law. . . . The underlying policy embodied in the rule is not generally subject to challenge before the agency.

> A general statement of policy, on the other hand, does not establish a 'binding norm.' . . . A policy statement announces the agency's tentative intentions for the future. When the agency applies the policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued.

*Id.,* 506 F.2d at 38 (footnote and citations omitted).

This Court applied this distinction in *Elkin* and *Rushton Mining.* The Court in *Elkin* reversed a DPW decision that was based upon an intra-office memorandum rather than an actual individual adjudication. The Court explained that, because the memorandum established a rule of general application, it had to be properly promulgated as a regulation in order to be given effect. The Court in *Rushton Mining* affirmed an Environmental Hearing Board decision that invalidated certain standard conditions inserted in a mining permit issued by the Department of Environmental Resources. The Court explained that the Department was attempting to implement a uniform statewide policy with those conditions that would necessarily be binding upon the agency.

The Examiner in the case sub judice found that the moratorium criteria were a series of developing criteria meant to act as guidelines for providers and that DPW did not intend the criteria to be regulations that would bind the Secretary's action. That finding is supported by the testimony of Mr. Kane and Richard Lee, who was DPW's Director of Long–Term Care Programs during the relevant time period. The finding is also supported by the Secretary's January 1988 letter, which explained that DPW considered waiver requests "on a case-by-case basis" and stated that the criteria were "to be considered." Nothing in the letter suggests that the criteria were absolute and binding, and DPW treated the March 1989 additional criterion as a guideline subject to case-by-

case analysis. Because the criteria represented policy statements rather than regulations, the Court rejects Baldwin's argument that the criteria were binding upon DPW and that DPW was required to publish changes to the criteria.

Baldwin contends that DPW demanded that it exceed its projected financially feasible MA occupancy by an additional 20 percent to qualify for a moratorium waiver. DPW never prompted Baldwin to seek a moratorium waiver and consequently never required Baldwin to exceed its projected financially feasible MA occupancy. To the contrary, Baldwin's own witness testified that Baldwin's financial trouble was caused by a lack of occupancy and that MA occupancy increased when Baldwin attempted to fill the facility on a first come, first serve basis. Baldwin does not argue that it has been inadequately reimbursed for its net operating costs of caring for MA patients, and it produces no legal authority to establish that it is entitled to reimbursement for capital depreciation and interest when Baldwin's owners constructed the facilities knowing that it would not receive such reimbursement.

 Baldwin next contends that DPW should be equitably estopped from denying Baldwin a moratorium waiver. Baldwin argues that it was misled by DPW into believing that it would receive a waiver if it resolved the two problems mentioned in the Secretary's January 1988 letter, that it reasonably relied upon DPW misrepresentations and that it suffered substantial detriment from DPW's refusal to grant the waiver. A party asserting equitable estoppel against a Commonwealth agency must establish three elements: (1) misleading words, conduct or silence by the agency; (2) unambiguous proof that the asserting party reasonably relied upon the agency's misrepresentation; and (3) the lack of a duty to inquire on the asserting party. *Chester Extended Care Center v. Department of Public Welfare*, 526 Pa. 350, 586 A.2d 379 (1991); *Cameron Manor, Inc. v.*

*Department of Public Welfare*, 681 A.2d 836 (Pa.Cmwlth.1996).

The Secretary never promised Baldwin a waiver, and no correspondence between Baldwin and DPW in the record suggests that Baldwin would automatically be granted a moratorium waiver if it met the criteria specified in the January 1988 letter. Baldwin's outside counsel, Thomas Hess, testified that Mr. Kane told him that Baldwin's waiver request would be approved if Baldwin resolved the two problems. Mr. Kane testified that he would not have made the alleged statement and that he did not recall his conversations with Mr. Hess. The Examiner found both witnesses credible and never resolved this discrepancy in their testimony. The Examiner did however find that Baldwin was aware that Mr. Kane lacked the authority to grant a moratorium waiver.

Furthermore, the evidence belies Baldwin's claim that it resolved either of the problems identified in the Secretary's January 1988 letter. The Office of the Chief Clerk for Allegheny County has no record of a resolution endorsing the letter from Chairman Foerster and no commissioner other than the chair signed the letter. More importantly, the evidence does not establish that Baldwin served the number of MA patients required by the Secretary's letter.

Baldwin may have temporarily attained an MA occupancy rate in excess of 60 percent around February 1989, but nevertheless Baldwin's MA occupancy rate for the entire fiscal year was 52.97 percent, and there is no evidence that Baldwin ever maintained a 60 percent MA occupancy beyond that short period around February 1989. Baldwin never committed to maintaining the MA occupancy rate specified by the Secretary, and, in fact, Baldwin informed DPW in a September 2, 1988 letter that accepting 60 percent MA occupancy was not possible for Baldwin. Baldwin offered 40 percent MA occupancy but conditioned that offer upon the grant of a moratorium waiver. Therefore, Baldwin has failed to establish the requisite ele-

ments of equitable estoppel against DPW. Accordingly, the order of the Director of the Bureau of Hearings and Appeals is affirmed.

### ORDER

AND NOW, this 27th day of June, 2000, the order of the Director of the Department of Public Welfare, Bureau of Hearings and Appeals is hereby affirmed.