BOROUGH OF BEDFORD, Municipal Authority of the Borough of Bedford, Brown Township Municipal Authority, Burnham Borough, Burnham Borough Authority, Borough of Chambersburg, Danville Borough, Derry Township (Dauphin County), Derry Township (York County), Dillsburg Borough, Dover Borough, Dover Township, East Pennsboro Township, East Pennsboro Township Sewer Authority, Elizabethtown Borough, Elizabethville Borough, Elizabethville Area Authority, Borough of Ephrata, Fairview Township, Fairview Township Authority, Franklin County General Authority, Gallitzin Borough Sewer and Disposal Authority, Hampden Township, Hampden Township Sewer Authority, Borough of Hanover, Hastings Area Sewer Authority, Highspire Borough, Borough of Hummelstown, Borough of Lewistown, City of Lock Haven, Londonderry Township, Lower Paxton Township, Lower Swatara Township, Lower Swatara Township Municipal Authority, Borough of Marysville, Middlesex Township Municipal Authority, Borough of Middletown, Middletown Borough Authority, Borough of New Cumberland, Newberry Township Municipal Authority, North Middleton Authority, North Middleton Township, Northeastern York County Authority, Northern Lebanon County Authority, Northwestern Lancaster County Authority, Paxtang Borough, Penn Township, Borough of Penbrook, Pine Creek Municipal Authority, Borough of Royalton, Shrewsbury Borough, Shrewsbury Borough Municipal Authority, Silver Spring Township, Silver Spring Township Authority, South Middleton Township, Springettsbury Township, Borough of Troy, Twin Boroughs Municipal Authority, Borough of Tyrone, Upper Allen Township, Wayne Township, West Hanover Township Water and Sewer Authority, West Manchester Township, York City Sewer Authority, Petitioners

v.

COMMONWEALTH of Pennsylvania, DEPARTMENT OF ENVIRONMENTAL PROTECTION; Kathleen McGinty, Secretary of Environmental Protection, Respondents.

Commonwealth Court of Pennsylvania.

Argued Sept. 10, 2008.
Decided April 14, 2009.

Steven A. Hann, Lansdale, for petition-
ers.

Douglas F. Brennan, Asst. Director and Dennis A. Whitaker, Asst. Chief Counsel, Harrisburg, for respondents.

Matthew B. Royer, Harrisburg, for intervenor, The Chesapeake Bay Foundation, Inc.

BEFORE: LEADBETTER, President Judge, and McGINLEY, Judge, and FRIEDMAN,[1] Judge, and COHN JUBELIRER, Judge, and SIMPSON, Judge, and LEAVITT, Judge, and BUTLER, Judge.

OPINION BY Judge LEAVITT.

The Borough of Bedford, *et al.* (collectively, Bedford Group) seeks relief from an enforcement policy of the Pennsylvania Department of Environmental Protection (DEP) undertaken to improve the quality of water in the Chesapeake Bay. The Bedford Group asserts that DEP's policy is actually a regulation that is void and unenforceable because it was not promulgated in accordance with the statutory procedures that must be satisfied before an administrative agency's regulation can take effect. Concluding that there exist outstanding factual questions that must be resolved before this central legal question can be resolved, we deny DEP's request for summary relief.

## Background

This lawsuit owes its origin to federal and state governmental efforts to improve the quality of water in the Chesapeake Bay. These efforts have been detailed in the Bedford Group's petition for review, which provides the source of this background.

The Federal Clean Water Act[2] identifies the Chesapeake Bay as "impaired" by poor water quality, caused, in part, by excess nutrients in the Bay's tributary streams. More than half of Pennsylvania lies within the Chesapeake Bay watershed, and the Susquehanna River contributes approximately half of the fresh water that flows into the Bay. For many years, Pennsylvania has been involved in joint state and federal efforts to improve the ecology of the Bay. In 2000, Pennsylvania's Governor, along with the Governors of Maryland and Virginia, the Mayor of the District of Columbia, the United States Environmental Protection Agency (EPA) and the Chesapeake Bay Commission signed the Chesapeake 2000 Agreement. DEP Application for Summary Relief, Exhibit 4. (DEP Exhibit ———). The Agreement identified the steps that had to be undertaken by the signing parties in order to improve the Bay's ecosystem, including the reduction of sediment, nitrogen and phosphorus levels in waters entering the Bay. Pennsylvania agreed to reduce Total Nitrogen discharged into its waters by 37 million pounds per year and to reduce Total Phosphorus by 1.1 million pounds per year. Accordingly, in 2005, DEP issued its "Pennsylvania's Chesapeake Bay Tributary Strategy" (Strategy) outlining its plan for reducing the nutrient and sediment loads in all Pennsylvania waters that reach the Bay.

The Bedford Group consists of a group of municipalities and authorities that operate wastewater and sewage treatment plants, which are known as "point sources" of pollution; pollutants generated by agriculture and land development are known as "non-point sources." In order to operate their plants, each member of the Bedford Group must obtain a National Pollution Discharge Elimination System

---

1. The decision in this case was reached before January 1, 2009, when Judge Friedman assumed the status of senior judge.

2. 33 U.S.C. §§ 1251–1387.

(NPDES) permit from DEP.[3] These permits establish the amount of pollutants that each point source may discharge into Pennsylvania waters in the course of operating its plant.[4] The Strategy announced that DEP will develop a NPDES permit that includes a new condition in the form of specific limits on the amount of nitrogen and phosphorus each permittee may discharge. The Strategy did not impose these limits on non-point sources because they are not required to obtain NPDES permits to operate.

In April 2007, DEP issued its "Chesapeake Bay Tributary Strategy Implementation Plan for NPDES Permitting" (Implementation Plan), announcing new guidelines for NPDES permits. The Implementation Plan stated that gradually, over a period of time, all existing NPDES permits would be revoked and reissued with a new permit condition: cap load limits for nitrogen and phosphorus. The Implementation Plan also explained the methodology by which new cap loads would be calculated. Members of the Bedford Group were notified of these changes by a letter from DEP and were instructed to prepare a plan and schedule for complying with the new cap loads.

In response to DEP's Implementation Plan, the Bedford Group filed a petition for review addressed to this Court's original jurisdiction. The Bedford Group alleges that the Strategy is an unlawful regulation that will cause its members to suffer substantial, direct and immediate harm, estimating that it will cost them one billion dollars or more to comply with the new nutrient cap loads. The Bedford Group argues that DEP's proposed cap loads are meaningless to the improvement of water quality in the Bay because point sources contribute only 11 percent of the nitrogen levels and 18 percent of the phosphorus levels found in Pennsylvania's waters. The major source of nutrients entering the Bay come from non-point sources, but the Strategy simply ignores this fact. An NPDES permit appeal by each member of the Bedford Group will result in protracted and piecemeal litigation before the Environmental Hearing Board that will yield potentially divergent results. The Bedford Group asserts that it has pled the elements necessary to pre-enforcement review of a regulation.[5]

3. NPDES permits are part of the Clean Water Act and may be administered by the United States Environmental Protection Agency or by a state environmental agency. *McGrath Construction, Inc. v. Upper Saucon Township Board of Supervisors and Locust Valley Gold Club, Inc.*, 952 A.2d 718, 726 n. 8 (Pa. Cmwlth.2008). In Pennsylvania, DEP administers the NPDES permit program and has promulgated regulations at 25 Pa.Code Chapter 92 incorporating the federal NPDES regulations. The federal regulation at 40 C.F.R. § 122.4(d) (2008) provides that no NPDES permit may be issued "[w]hen the imposition of conditions cannot ensure compliance with the applicable water quality requirements *of all affected States.*" (emphasis added). Pennsylvania incorporated by reference this federal NPDES regulation at 25 Pa.Code § 92.2(b)(2). Pennsylvania also has its own NPDES regulation at 25 Pa.Code § 92.73(5).

4. *See* 25 Pa.Code § 92.3 ("A person may not discharge pollutants from a point source into surface waters except as authorized under an NPDES permit.").

5. In *Arsenal Coal Company v. Department of Environmental Resources*, 505 Pa. 198, 477 A.2d 1333 (1984), our Supreme Court held that a challenge to a regulation could be brought in advance of the agency's enforcement of the regulation. The Supreme Court explained that

[w]here the effect of the challenged regulations upon the industry regulated is direct and immediate, the hardship thus presented suffices to establish the justiciability of the challenge in advance of enforcement.

*Id.* at 209, 477 A.2d at 1339. The Court concluded that where the plaintiffs would face lengthy, piecemeal litigation and their compliance would be costly while the validity

The Bedford Group seeks to have the Strategy nullified under several legal theories set forth in eight separate counts. They are as follows:

Count 1: Violation of Administrative Code of 1929. Because only the Environmental Quality Board has the power to promulgate rules and regulations, DEP lacked authority to promulgate a regulation such as the Strategy.

Count 2: Violation of Commonwealth Documents Law. The Strategy is unlawful because it was not published in accordance with the public notice and comment procedures required in the Commonwealth Documents Law.

Count 3: Violation of Administrative Agency Law. To the extent the Strategy constitutes an adjudication of DEP, it is unlawful because there was no notice or an opportunity to be heard.

Count 4: Violation of Regulatory Review Act. The Strategy is unlawful because it was promulgated without review by the appropriate committees of the General Assembly's Senate and House of Representatives or review and approval by the Independent Regulatory Review Commission.

Count 5: Violation of Commonwealth Attorneys Act. The Strategy is unlawful because it was promulgated without review by either the Attorney General or General Counsel.

Count 6: Violation of the Pennsylvania Clean Streams Law. The Strategy is unlawful because it does not conform to the Clean Streams Law, the only Pennsylvania statute that would authorize the adoption of a regulation such as that set forth in the Strategy.

Count 7: Constitutional Violations. By promulgating the Strategy in an unlawful manner, DEP has taken the property of Petitioners in violation of the Pennsylvania and United States Constitutions; has denied Petitioners their property without due process of law; has made or enforced a law that abridges the privileges and immunities of Petitioners; has enacted laws impairing Petitioners' obligation of contracts; and has violated the principles of equal protection and due process.

Count 8: Violation of Other State and Federal Laws and Regulations. The cap load limits are not standards authorized by the Clean Water Act and 25 Pa.Code § 92.2c(b); the cap load limits are not best professional judgment-based limits authorized by the Clean Water Act; the cap load limits are not based on existing water quality standards set forth in duly-promulgated regulations; DEP has not made a finding that the cap load limits are necessary, which finding is required by 40 CFR § 122.44(d)(1); DEP did not prepare a wasteload allocation, as required by 25 Pa.Code § 92.59; and DEP did not prepare a fact sheet setting forth the legal and factual basis for the requirements of the Strategy, including the calculations required by 40 CFR §§ 124.8 and 124.56.

of the regulation was litigated, a pre-enforcement challenge to a regulation was appropriate. *Id.* at 210, 477 A.2d at 1339–1340. *See also Home Builders Association of Chester and Delaware Counties v. Department of Environmental Protection*, 828 A.2d 446 (Pa.Cmwlth. 2003). In *Home Builders,* this Court concluded that the pre-enforcement issue of whether DEP's policy was an improperly promulgated regulation was ripe for judicial review because the appellants had pled that the policy could potentially cause them "to suffer financial losses and substantial increased costs, the inability to obtain permits or to obtain permits in a timely manner" and other serious harm. *Id.* at 452 n. 6. By this analysis, the pre-enforcement challenge to DEP's Strategy is properly before this Court.

Based on the foregoing, the Bedford Group has requested this Court to declare the Strategy null and void and to enjoin its implementation or enforcement.

In response to the Bedford Group's petition for review, DEP filed an answer and new matter with affirmative defenses. Thereafter, DEP filed an application for summary relief together with supporting exhibits.[6] Asserting that there are no material facts in dispute, DEP requested a judgment that its plan to impose specific nutrient limits on point source permittees is a statement of policy, or guideline, and not a regulation with the force and effect of a law.[7]

As an initial matter, DEP argues that its announcement of plans for controlling nutrient pollution in the Chesapeake Bay watershed is not limited to the Strategy. Rather, these announcements consist of the 2005 Strategy; DEP's December 2006 revisions to the 2005 Strategy; and DEP's April 2007 Implementation Plan notice to sewage and wastewater treatment plants covered by the NPDES permit program. DEP Exhibits 1–3. Therefore, to decide the Bedford Group's claim, this Court must consider all these documents, known as the "Compliance Plan," and not just one component, the Strategy.[8] DEP then argues that the Compliance Plan constitutes a statement of policy, not a regulation, which merely provides guidance to DEP staff and to those regulated by the Clean Water Act. As a statement of policy, the Compliance Plan was not required to be promulgated in accordance with the statutory procedures established for regulations.

The crux of the Bedford Group's action is that the Compliance Plan is an invalid regulation that was not properly promulgated. All of the Bedford Group's additional legal grounds for objecting to the Compliance Plan follow from the premise that the Compliance Plan is a regulation. The question of whether the Compliance

---

**6.** DEP filed its application pursuant to Rule 1532(b) of the Pennsylvania Rules of Appellate Procedure, which provides:

> (b) Summary relief. At any time after the filing of a petition for review in an appellate or original jurisdiction matter the court may on application enter judgment if the right of the applicant thereto is clear.

PA. R.A.P. 1532(b). In ruling on the application for summary relief, this Court must determine whether, based on the undisputed facts, DEP has a clear right to the relief requested. *Bell Atlantic–Pennsylvania, Inc. v. Turnpike Commission*, 703 A.2d 589, 590 (Pa. Cmwlth.1997).

The record, for purposes of the motion for summary relief, is the same as a record for purposes of a motion for summary judgment. *Meggett v. Pennsylvania Department of Corrections*, 892 A.2d 872, 879 n. 13 (Pa.Cmwlth. 2006). Rule 1035.1 of the Pennsylvania Rules of Civil Procedure provides that the record in a motion for summary judgment includes any

> (1) pleadings,
> (2) depositions, answers to interrogatories, admissions and affidavits, and

(3) reports signed by an expert witness ... PA. R.C.P. No. 1035.1. Therefore, in "ruling on a motion for summary judgment, a court must consider not only the pleadings but other documents of record, such as exhibits." *American Federation of State, County and Municipal Employees v. Commonwealth*, 111 Pa. Cmwlth. 81, 533 A.2d 785, 788 (1987).

**7.** DEP also seeks summary relief on the basis of the lack of standing of most members of the Bedford Group. The plan is phasing in the new cap load limits on nitrogen and phosphorus. DEP Exhibit 3. Only "Phase 1" NPDES permittees are currently affected, and only some of the Bedford Group are Phase 1 permittees. Finally, DEP asserts that Secretary of Environmental Protection Kathleen McGinty is not properly a party to this action. We note that Secretary McGinty is no longer DEP's Secretary. John Hanger is now Acting Secretary.

**8.** We agree and, thus, hereinafter all references will be to the Compliance Plan, not to the Strategy.

Plan constitutes a regulation, as opposed to a statement of policy, cannot be decided exclusively on the evidence provided by DEP because that evidence is incomplete on how the Compliance Plan will function. Accordingly, we will deny DEP's request for a summary judgment that the Compliance Plan is a statement of policy. We do not address the other legal theories advanced by Bedford Group, or DEP's responses thereto. Likewise, we neither address nor decide the wisdom of DEP's standards for NPDES permits or their validity under the Clean Water Act, the Clean Streams Law or any applicable regulation.

### Promulgation of a Regulation

We begin with a review of what an agency must do to promulgate a regulation. This requires an examination of what constitutes a regulation and how it differs from a statement of policy, under the applicable statutes as well as case law precedent.

The act commonly referred to as the Commonwealth Documents Law [9] addresses agency rule-making. A regulation is defined in Section 102(12) as

> any rule or regulation, or order in the nature of a rule or regulation, promulgated by an agency under statutory authority in the administration of any statute administered by or relating to the agency, or prescribing the practice or procedure before such agency.

45 P.S. § 1102(12). Section 102(13) defines a "statement of policy" as

> any document, except an adjudication or a regulation, promulgated by an agency which sets forth substantive or procedural personal or property rights, privileges, immunities, duties, liabilities or obligations of the public or any part thereof, *and includes,* without limiting the generality of the foregoing, *any document interpreting or implementing any act* of Assembly enforced or *administered by such agency.*

45 P.S. § 1102(13) (emphasis added). These definitions do little to separate a statement of policy from a regulation.[10]

 Case law has established that a regulation has the force and effect of law. *City of Pittsburgh, Department of Personnel and Civil Service Commission v. Pennsylvania Human Relations Commission,* 157 Pa.Cmwlth. 564, 630 A.2d 919, 921 n. 4 (1993). The same is not true of a statement of policy, which expresses, at most, an agency's interpretation of law, as that law is expressed in a statute or a regulation. Accordingly, a person may be charged with a violation of a statute or regulation, but not with a violation of a statement of policy. It is always the agency's burden to convince the tribunal that its interpretation of the statute or regulation it seeks to enforce is correct, whether or not that interpretation has ever been promulgated in a statement of policy.

 Although a regulation and statement of policy are each "promulgated" by an agency, the method of promulgation differs. An agency's promulgation of a regulation is subject to the procedural requirements of the Commonwealth Documents Law, and other statutes, but there are no such requirements for a statement of policy. *Eastwood Nursing and Rehabilitation Center v. Department of Public Welfare,* 910 A.2d 134, 141–142 (Pa. Cmwlth.2006). The value of a statement

---

**9.** Act of July 31, 1968, P.L. 769, *as amended,* 45 P.S. §§ 1102–1602.

**10.** Nevertheless, a statement of policy is a promulgation that interprets or implements an enactment, thereby suggesting that a "regulation" does more than interpret.

of policy is that it communicates, in advance of a discrete agency action, how the agency interprets a law and intends to give it effect. A statement of policy can be published in the Pennsylvania Code, but publication is not required; by contrast, a regulation must be published in the Pennsylvania Code. *Department of Corrections and Department of Public Welfare v. Pennsylvania State Corrections Officers Association,* 932 A.2d 359, 365 n. 9 (Pa. Cmwlth.2007).

The basic procedures by which an agency promulgates a regulation are set forth in the Commonwealth Documents Law. In essence, these procedures require an agency to give notice to the public of its proposed rule-making and an opportunity for the public to comment.[11] *See Eastwood Nursing,* 910 A.2d at 141 n. 13. However, this is only the beginning. The agency must also obtain the approval of the Attorney General and the General Counsel of a proposed regulation's form and legality. Sections 204(b) and 301(10) of the Commonwealth Attorneys Act, Act of October 15, 1980, P.L. 950, 71 P.S.

§§ 732–204(b) and 732–301(10). Finally, an agency's regulation must also undergo legislative scrutiny in accordance with the Regulatory Review Act.[12]

For environmental program regulations, there is one more step. DEP lacks authority to promulgate regulations that relate to the programs it administers and enforces. Such regulations are promulgated by the Environmental Quality Board after public comment and hearings. Section 1920–A of the Administrative Code of 1929, Act of April 9, 1929, P.L. 177, *as amended,* 71 P.S. § 510–20 [13]; *Department of Environmental Protection v. North American Refractories Company,* 791 A.2d 461, 462 (Pa.Cmwlth.2002).

▮▮▮ The effect of an agency's failure to promulgate a regulation in accordance with these various statutory requirements is to have the regulation declared a nullity. *Automobile Service Councils of Pennsylvania, et al. v. Larson,* 82 Pa. Cmwlth. 47, 474 A.2d 404, 405 (1984). It is little wonder that agencies take the state-

---

11. More fully, the requirements for an agency promulgating a regulation include, *inter alia,* (1) providing notice to the public of its intent to promulgate, amend or repeal an administrative regulation; (2) accepting, reviewing and considering written comments regarding the proposed regulation; (3) obtaining legal approval of the proposed regulation; and (4) depositing the text of the regulation with the Legislative Reference Bureau for publication in the *Pennsylvania Bulletin.* Sections 201, 202, 205 and 207 of the Commonwealth Documents Law, 45 P.S. §§ 1201, 1202, 1205, and 1207.

12. Act of June 25, 1982, P.L. 633, *as amended,* 71 P.S. §§ 745.1–745.12. Section 5 of the Regulatory Review Act requires the agency to submit its proposed regulation to the appropriate committees of the Senate and House of Representatives; undergo public notice and a comment period; and obtain approval of the Independent Regulatory Review Commission. 71 P.S. § 745.5.

13. It states, in relevant part, as follows:

(b) The Environmental Quality Board shall have the power and its duties shall be to formulate, adopt and promulgate such rules and regulations as may be determined by the board for the proper performance of the work of the department ...

(c) The board shall continue to exercise any power to formulate, adopt and promulgate rules and regulations, heretofore vested in the several persons, departments, boards and commissions set forth in section 1901(a) of this act, and any such rules and regulations promulgated prior to the effective date of this act shall be the rules and regulations of the Department of Environmental [Protection] until such time as they are modified or repealed by the Environmental Quality Board.

71 P.S. § 510–20(b), (c).

ment of policy route, which is free of the burdens imposed upon an agency's promulgation of a regulation. However, if a statement of policy is actually an unpublished regulation in disguise, it will be nullified due to the agency's failure to obey the processes applicable to a regulation. Thus, courts must distinguish between the two types of agency promulgations.

If an agency simply calls its promulgation a regulation, this ends the inquiry. More difficult is discerning whether a pronouncement calling itself a "statement of policy" is, in truth, a regulation. *Department of Environmental Resources v. Rushton Mining Company*, 139 Pa. Cmwlth. 648, 591 A.2d 1168, 1171 (1991).

 Our Supreme Court has explained that a regulation has the effect of a "binding norm" and a statement of policy does not. In *Pennsylvania Human Relations Commission v. Norristown Area School District*, 473 Pa. 334, 374 A.2d 671 (1977), the Supreme Court explained:

> An agency may establish binding policy through rulemaking procedures by which it promulgates substantive rules, or through adjudications which constitute binding precedents. *A general statement of policy is the outcome of neither a rulemaking nor an adjudication; it is neither a rule nor a precedent but is merely an announcement to the public of the policy which the agency hopes to implement in future rulemakings or adjudications.* A general statement of policy, like a press release, presages an upcoming rulemaking or

announces the course which the agency intends to follow in future adjudications. The critical distinction between a substantive rule and a general statement of policy is the different practical effect that these two types of pronouncements have in subsequent administrative proceedings.... *A properly adopted substantive rule establishes a standard of conduct which has the force of law ....* A general statement of policy, on the other hand, does not establish a 'binding norm'.... *A policy statement announces the agency's tentative intentions for the future.* When the agency applies the policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued.

*Id.* at 349–350, 374 A.2d at 679 (quoting *Pacific Gas & Electric Co. v. Federal Power Commission*, 506 F.2d 33, 38 (1974)) (emphasis added).[14] Expanding on these principles, this Court has explained that a

> "[b]inding norm" means that the agency is bound by the statement until the agency repeals it, and if the statement is binding on the agency, it is a regulation.

*Home Builders Association of Chester and Delaware Counties v. Department of Environmental Protection*, 828 A.2d 446, 451 (Pa.Cmwlth.2003) (quoting *Rushton Mining Company*, 591 A.2d at 1173). The determination of whether a statement of policy is actually an unpromulgated regulation is a question of law. *Millcreek Manor v. Department of Public Welfare*, 796 A.2d 1020, 1026 n. 10 (Pa.Cmwlth.2002).[15]

---

**14.** In *Norristown*, the Supreme Court held that the Pennsylvania Human Relations Commission's desegregation plan was a general statement of policy and not a regulation because the Commission used the definition of "segregated school" found in the plan as a flexible guideline. *Norristown*, 473 Pa. at 338, 374 A.2d at 673.

**15.** In order to ascertain whether a binding norm has been created, "the reviewing tribunal must consider the provision's plain language, the manner in which it has been implemented by the agency and whether the section restricts the agency's discretion." *Millcreek Manor*, 796 A.2d at 1026.

 A statement of policy "tracks a statute and does not expand upon its plain meaning." *Groce v. Department of Environmental Protection*, 921 A.2d 567, 578 (Pa.Cmwlth.2007). However, a regulation must also track the statute. *Commonwealth of Pennsylvania v. Gilmour Manufacturing Company*, 573 Pa. 143, 149, 822 A.2d 676, 679 (2003). A document consisting of instructions based on the agency's interpretation of statutory requirements, which can be applied on a case-by-case basis, is a statement of policy. *Central Dauphin School District v. Department of Education*, 147 Pa.Cmwlth. 426, 608 A.2d 576, 582 (1992).[16] As stated in *Home Builders Association of Chester*, 828 A.2d at 451, a pronouncement that leaves the agency with discretion to deviate from its terms will be held to be a statement of policy, not a regulation.

 In sum, a regulation is binding on an agency, and a statement of policy is not. A statement of policy expresses what the agency hopes to implement in future rulemakings or "adjudications," but has no immediate effect. *Norristown*, 473 Pa. at 349, 374 A.2d at 679. By contrast, a regulation "establishes a standard of conduct which has the force of law." *Id.*

**16.** At issue in *Central Dauphin* was an amendment to the Public School Code of 1949, Act of March 10, 1949, P.L. 30, *as amended,* 24 P.S. §§ 1–101–27–2702, which required school districts to reopen and adjust their fiscal year 1991–1992 budgets. The Secretary of Education issued budget reopening instructions which the school district challenged as being a regulation. This Court held that the instructions were a statement of policy because the Secretary's instructions merely provided guidance on how the Secretary interpreted the School Code's requirements on budget reopening.

**17.** Section 117 of the Clean Water Act provides in relevant part:

(g) Chesapeake Bay Program.

## DEP Position

DEP defends its Compliance Plan as necessary to save the Bay. More particularly, Maryland cannot meet its new water quality standards, which have been approved by the Federal EPA, unless Pennsylvania improves the quality of its waters flowing downstream to Maryland. Ultimately, however, DEP contends that it is the Clean Water Act, as well as state statutes and regulations, that require Pennsylvania point source permittees to limit their discharge of nitrogen and phosphorus. The Compliance Plan, according to DEP, simply announces how these statutory requirements will be enforced in the course of issuing new NPDES permits.[17]

DEP points out that the nutrient cap loads set forth in the original 2005 Strategy were never implemented at the behest of the sewage treatment plant industry and that those cap loads have been evolving ever since. The Compliance Plan, it argues, is a model of flexibility. For example, the Compliance Plan offers a nutrient trading program, which will allow point source permittees to purchase nutrient reduction "credits" from other permittees. This flexibility was developed after extensive input from sewage and wastewater treatment plants. Further,

(1) Management strategies. The Administrator, in coordination with other members of the Chesapeake Executive Council, shall ensure that management plans are developed and implementation is begun by signatories to the Chesapeake Bay Agreement to achieve and maintain—
(A) the nutrient goals of the Chesapeake Bay Agreement for the quantity of nitrogen and phosphorus entering the Chesapeake Bay and its watershed;
(B) the water quality requirements necessary to restore living resources in the Chesapeake Bay ecosystem.
* * *
33 U.S.C. § 1267(g).

the Compliance Plan itself disclaims that it is a regulation, and it promises that DEP will use discretion when issuing NPDES permits.

DEP likens its Compliance Plan to its Comprehensive Stormwater Management Policy that was reviewed by this Court in *Home Builders Association of Chester*, 828 A.2d 446. In that case, DEP issued a Stormwater Management Policy that, *inter alia*, required owners of one to five acres of land to obtain an NPDES permit for certain construction activities that had never before required a permit. The Home Builders Association challenged the Stormwater Policy, arguing that it was a regulation, not a statement of policy, that was invalid because it had not been adopted in accordance with the procedures required by statute.

This Court dismissed the Home Builders Association's petition for review. Applying the Supreme Court's Norristown analytical framework, we concluded as follows:

> [T]he Stormwater Policy ... merely describes a recommended approach for achieving compliance with the existing requirements. As DEP contends, the Policy recommends "a uniform approach to stormwater management that the Department believes will assure consistency in its stormwater programs and assure compliance with the existing use protection required by 25 Pa.Code § 93.4c(a). The Policy's stated goal is to implement existing requirements, not to create new requirements."

*Home Builders Association of Chester*, 828 A.2d at 453. This Court also found relevant the disclaimer in the policy stating that

> the policies and procedures herein are not adjudications or regulations. There is no intent on the part of DEP to give the rules in these policies that weight or deference.

*Id.* Finally, we observed that DEP retained the discretion not to apply the policy in an individual case. *Id.*

DEP contends that *Home Builders Association of Chester* compels the conclusion that its Compliance Plan is a statement of policy, not a regulation. Further, it notes that any member of the Bedford Group that finds itself aggrieved by the cap load requirements in its NPDES permit has a remedy by way of an appeal to the Environmental Hearing Board.

### The Bedford Group's Position

The Bedford Group contends that DEP is not entitled to summary relief because whether or not the Compliance Plan is a binding norm is a factual question that is in dispute. The Bedford Group also argues that the Compliance Plan did more than simply pronounce DEP's statement of future intent in the manner of a press release. It contends that the Compliance Plan sets a "standard of conduct" for nutrient cap loads that is fixed and binding. *Norristown*, 473 Pa. at 350, 374 A.2d at 679. Further, there is no "plain statement" in the Clean Water Act that imposes a specific cap load limit for nitrogen and phosphorus upon NPDES permittees. *Groce*, 921 A.2d at 578.

The Bedford Group argues that this case is governed by *Eastwood Nursing*, 910 A.2d 134. In *Eastwood Nursing*, a nursing home appealed the denial of its application for a contract to be a Medical Assistance provider. It challenged the statement of policy that adversely affected its application, asserting that it was an invalid, unpublished regulation. The Department of Welfare's statement of policy contained a disclaimer that it was not a regulation and an assurance that the Department retained discretion to deviate from the statement of policy in the case of a particular nursing home. By its very

terms, the policy had future, not immediate, effect. Notwithstanding these provisions, we concluded that the so-called statement of policy actually functioned as a regulation. Because the individuals charged with the day-to-day authority to implement the statement of policy never deviated from its terms, the so-called statement of policy functioned as a binding norm.

The Bedford Group asserts that like the statement of policy in *Eastwood Nursing*, the Compliance Plan may use the magic words expected to be found in a statement of policy, such as the disclaimer that it is not a regulation, but in practice it will function as a regulation. The Bedford Group contends that the Compliance Plan establishes "a standard of conduct which has the force of law." *Norristown*, 473 Pa. at 350, 374 A.2d at 679. Only with discovery into the directives DEP has given to staff in the field, can it be determined whether the Compliance Plan will function as a regulation or as a statement of policy. Accordingly, the Bedford Group contends that judgment cannot be granted to DEP at this point in the proceeding.

### The Compliance Plan

We begin with a review of the three different Compliance Plan documents, on which DEP bases its motion for summary relief. The 2005 Strategy stated that DEP "will establish annual Total Nitrogen (TN) and Total Phosphorus (TP) load limits for the wastewater dischargers." DEP Exhibit 1, at 46. It then stated that DEP would propose cap loads of 8 milligrams of TN per liter of water and 1 milligram of TP per liter of water "at flows *equal to those projected for the year 2010*" for each point source. DEP Exhibit 1, at 46 (emphasis added). However, this was amended in a 2006 document. Therein, DEP revised the limits to 6 milligrams of TN per liter of water and 0.8 milligram of TP

per liter of water "*at design flow*." DEP Exhibit 2, at 1 (emphasis added).

Then, on April 24, 2007, DEP issued its "Implementation Plan for NPDES Permitting." DEP Exhibit 3. This document begins with the following caveat:

The strategy outlined in this guidance document is intended to supplement existing requirements. *Nothing in the strategy shall affect regulatory requirements. The information herein is not an adjudication or a regulation.* There is no intent on the part of the Department to give the strategy described in this document that weight or deference. This document establishes the framework, within which the Department will exercise its administrative discretion in the future. *The Department reserves the discretion to deviate from this strategy if circumstances warrant.*

DEP Exhibit 3, at 1 (emphasis added). The Implementation Plan advises that in the future DEP will be revoking and reissuing NPDES permits with the cap loads adopted in the 2006 amendment. It explains that the new standards will be phased in over time; however, any facility is left free to choose an earlier implementation schedule. The document also explains that a point source would be able to discharge over its allocated cap load. if it purchased nutrient credits or generated an offset. The document specifies that cap loads

may be achieved by any combination of capital upgrade, effluent trading, land application of effluent with appropriate agronomic nutrient uptake, recycle and reuse, offsets for replacement of existing sources or installation of BMPs [best management practices].

DEP Exhibit 3, at 6. The Implementation Plan states that "DEP *will continue development* of the Watershed NPDES Permit

approach in order to facilitate implementation of the Chesapeake Bay Tributary Strategy." DEP Exhibit 3, at 4 (emphasis added).

In many respects, the Compliance Plan is similar to the Stormwater Management Policy at issue in *Home Builders Association of Chester*. It contains a disclaimer that it is not an adjudication or regulation; it speaks in terms of future plans for permittees; it offers different approaches to satisfying the new cap loads; and it recites that DEP retains discretion on the timetable and method by which a facility will satisfy the new cap loads. These expressions of future intent, flexibility and commitment to use discretion support DEP's position that the Compliance Plan is a statement of policy.

■■ However, there are other factors that must be considered. The Bedford Group contends, for example, that the cap load limits conflict with the terms of existing regulations. A regulation can only be repealed or amended by adoption of another regulation. *See, e.g.*, Section 201 of the Commonwealth Documents Law, 45 P.S. § 1201 (providing that the procedure contained therein applies not only to promulgation of a new regulation, but also to "amend[ment] or repeal" of existing regulations); *City of Philadelphia v. Fraternal Order of Police, Lodge No. 5*, 132 Pa.Cmwlth. 631, 574 A.2d 123, 125 (1990) (explaining that merely announcing

a new policy does not effect an amendment to a governing regulation; proper promulgation is necessary). A potential conflict with existing regulation is one factor that must still be addressed, as is the question of whether the cap load limits for nitrogen and phosphorus have a logical place in the existing NPDES regulation. DEP's case is based entirely on what the documents in the Compliance Plan say and does not address these other factors that may, or may not, support the conclusion that the Compliance Plan is a regulation.

■ Even if this additional analysis supported DEP's position, however, it is too early in the litigation to grant judgment to DEP.[18] The Compliance Plan sets a specific standard. The point source cap load is fixed at 6 milligrams of TN per liter of water and 0.8 milligrams of TP per liter of water measured by the plant's design flow. DEP Exhibit 2, at 1. DEP argues that it retains discretion, but it does not argue that these specific cap loads will vary from permit to permit. As the Bedford Group observes, "the cap load remains the same." Bedford Group Brief in Opposition to DEP's Application for Summary Relief, at 26.

The Bedford Group asserts that discovery into the use of the Compliance Plan is needed. Specifically it seeks discovery to learn answers to questions, some of which follow:

18. The dissent would grant summary relief to DEP, concluding that the nitrogen and phosphorus standards for NPDES permits set forth in the Compliance Plan track the Clean Water Act. The majority does not hold otherwise. Rather, it holds, simply, that it is too early in the litigation to determine whether those standards constitute a statement of policy or a regulation. DEP has adopted extensive regulations related to NPDES permits under authority of the Clean Water Act; one of the Bedford Group's claims is that the Compliance Plan is inconsistent with those existing regulations. The Clean Water Act does not relieve the states of having to follow whatever procedural requirements they may have established with respect to the initiation and implementation of a new enforcement policy. In *Eastwood Nursing*, 910 A.2d 134, this Court held that where a so-called statement of policy functions as a binding norm, it was subject to the procedural requirements established for the promulgation of a regulation. The dissent does not distinguish or discuss *Eastwood Nursing*.

- How have the Department personnel interpreted and implemented the Strategy?
- How much discretion can Department personnel exercise when implementing the Strategy and how much discretion is actually being exercised?
- What happens to a permittee that does not comply with the requirements of the Strategy?
- What internal guidance, either written or oral, was given to the Department's regional offices about implementation of the Strategy, when issuing NPDES permits?

*Id.* at 29–30. This additional evidence will be probative of how the Compliance Plan actually functions.

We agree with the Bedford Group that understanding how a putative statement of policy functions in the field is more probative than self-serving statements to the effect that the agency staff retains discretion and will be flexible. Accordingly, it is appropriate that the Bedford Group's above-listed questions be answered before a final determination is made on the legal status of the Compliance Plan. Whether DEP's Compliance Plan is a regulation cannot be determined simply by looking at its component documents. Accordingly, DEP's motion for summary relief on this central issue must be denied.

### Dismissal of Secretary McGinty

We now turn to DEP's request that Secretary McGinty be dismissed from this action. In effect, DEP seeks partial summary relief. The Pennsylvania Rules of Appellate Procedure authorize the Court to "enter judgment." PA. R.A.P. 1532(b). There is no reason why DEP cannot be granted a partial judgment.[19]

DEP asserts that this Court should dismiss Secretary McGinty because the petition for review contains no allegations that relate to acts or omissions of Secretary McGinty. Further, Bedford Group seeks relief against DEP, not its cabinet officer. We agree and will dismiss Secretary McGinty from this action.

### Dismissal of Non–Phase I Petitioners

█ DEP also requests that this Court dismiss all members of the Bedford Group who are not "Phase I Petitioners," *i.e.*, persons who have not yet been issued revised permits containing the new nutrient cap loads. DEP contends that the Non–Phase I members of the Bedford Group lack standing because their permits are not yet scheduled for revision. The Bedford Group counters all members of the Bedford Group have standing because, sooner or later, all will be subject to the new cap load requirements. We agree with the Bedford Group. This matter is properly before this Court in our equity jurisdiction as a pre-enforcement challenge to DEP's Compliance Plan. *See Arsenal Coal Co. v. Department of Environmental Resources,* 505 Pa. 198, 209, 477 A.2d 1333, 1339 (allowing pre-enforcement review where "the effect of the challenged regula-

---

19. Partial summary judgment can be granted under Rule 1035.2 of the Rules of Civil Procedure. The official note which accompanies this rule provides that "[p]artial summary judgment, interlocutory in character, may be rendered on one or more issues of liability, defense or damages." PA. R.C.P. No. 1035.2, Note. As explained in the official note to PA. R.A.P. 1532, the relief authorized by Rule 1532(b) is similar to the type of relief envisioned by the Pennsylvania Rules of Civil Procedure regarding … summary judgment. However, such relief may be requested before the pleadings are closed where the right of the applicant is clear. PA. R.A.P. 1532, Note. In sum, a motion for partial summary relief is appropriate under PA. R.A.P. 1532(b).

tions upon the industry regulated is direct and immediate."). As such, all members of the Bedford Group are properly a party to the action, regardless of whether they have presently been issued a permit with new cap load limits.

**Motion to Amend Petition for Review**

Finally, we address the Bedford Group's motion for leave to amend its petition for review to add additional petitioners pursuant to PA. R.C.P. No. 1033.[20] The Bedford Group seeks to add fourteen additional municipalities and municipal authorities as petitioners. DEP opposed the motion, asserting that many of the existing petitioners lack standing and that allowing new petitioners to enter the litigation at this late date would allow these new petitioners to avoid DEP's standing challenge.[21]

 The decision to allow an amendment is committed to the sound discretion of the court. *Burger v. Borough of Ingram*, 697 A.2d 1037, 1041 (Pa.Cmwlth. 1997). "Amendments are to be liberally permitted except where surprise or prejudice to the other party will result, or where the amendment is against a positive rule of law." *Id.* Because we have determined that all members of the Bedford Group have standing, and not only the Phase I Petitioners, adding more petitioners at this point will not prejudice DEP. Therefore, we grant the Bedford Group's motion to add additional petitioners.

**Conclusion**

For the above reasons, we deny DEP's motion for summary relief that its Compli-

ance Plan is a statement of policy. We dismiss Secretary McGinty from the action. We deny DEP's challenge to the standing of members in the Bedford Group not yet covered by the Phase I permits. Finally, we grant the Bedford Group's motion to add new petitioners.

**ORDER**

AND NOW, this 14th day of April, 2009, the motion for summary relief filed by the Commonwealth of Pennsylvania, Department of Environmental Protection and Kathleen McGinty, Secretary of Environmental Protection is hereby GRANTED as to the request to dismiss Secretary McGinty from the action. The remainder of the motion for summary relief as to whether the Compliance Plan is a statement of policy and as to whether some petitioners lack standing is DENIED. The Motion for Leave to Amend the Petition for Review to Add Additional Petitioners is hereby GRANTED.

DISSENTING OPINION BY Judge McGINLEY.

I respectfully dissent.

The DEP is entitled to the summary judgment relief it requests. There is no genuine dispute as to any *material* fact. The record supports the conclusion that the DEP's Compliance Plan is a statement of policy and not a regulation. The NPDES permits issued by the DEP to Petitioners meet all regulatory and statu-

---

20. Rule 1033 provides in relevant part:
 A party, either by filed consent of the adverse party or by leave of court, may at any time change the form of action, correct the name of a party or amend his pleading.
 PA. R.C.P. No. 1033.

21. DEP also asserts that the Bedford Group should be required to file an application for

leave to intervene along with a concise statement of the interest of the applicant and the grounds upon which intervention is sought under the correct rule, which is PA. R.A.P. 1531(b). While a filing under Rule 1531(b) would be appropriate, we do not require it because we would reach the same result regardless of the form of the application.

tory requirements of the Chesapeake Bay Program and the federal Clean Water Act.[1] The load restrictions in the subject NPDES permits are based on water quality standards for the Chesapeake Bay established by the State of Maryland and approved by the EPA. Under Section 303 of the federal Clean Water Act, Pennsylvania is required to achieve the water quality standards established by Maryland. The DEP has merely conveyed to the regulated community, via the Compliance Plan, its recommended approach for complying with these standards.

At the outset, I agree with the majority's analysis of the first prong of the "binding norm" test. The plain language of the Compliance Documents indicates that it is not a binding norm.

As the majority points out, the Compliance Plan is made up of three documents: (1) Pennsylvania's Chesapeake Bay Tributary Implementation Plan for NPDES Permitting (Implementation Plan); (2) Chesapeake Bay Tributary Strategy (Tributary Strategy); and (3) Alternative Allocation Strategy.

The plain language of the Compliance Documents indicates that it is not a binding norm. The DEP specifically states that it intends to treat the plan as a statement of policy and to retain considerable flexible discretion when developing and issuing NPDES permits to meet the Chesapeake Bay's water quality standards. The Implementation Plan expressly states:

> The strategy outlined in this *guidance document* is intended to supplement existing requirements. *Nothing* in this *strategy* shall affect regulatory requirements. The information herein *is not*

*an adjudication or a regulation.* There is *no intent* on the part of the Department to give the strategy described in this document weight or deference. This document establishes *the framework,* within which the Department will exercise its administrative discretion in the future. The Department *reserves the discretion* to deviate from this strategy if circumstances warrant.

Pennsylvania's Chesapeake Bay Tributary Strategy Implementation Plan for NPDES Permitting at 1 (Emphasis added).

The Tributary Strategy also makes it clear that it was not intended to be treated as a binding norm. The DEP's Tributary Strategy states unequivocally that it is a "plan" to correct the nutrient and sediment problems in the tributary watersheds of the Chesapeake Bay and that one of its purposes is to provide a "framework" to develop new program initiatives. Chesapeake Bay Tributary Strategy at 1.

Also, the Compliance Plan documents also make it clear that the DEP plans to retain *considerable flexible discretion* to develop and issue NPDES permits to meet water quality standards. The Tributary Strategy Plan stresses that it merely "establishes the framework, within the Department [DEP] *will* exercise its administrative discretion in the future" and that the DEP "*reserves the discretion to deviate from this strategy if circumstances warrant.*" Pennsylvania's Chesapeake Bay Tributary Strategy at 1. (Emphasis added).

It is true that an agency's characterization of its own action is not dispositive. *Rushton Mining,* 591 A.2d at 1173. How-

---

1. "NPDES" is an acronym for National Pollutant Discharge Elimination System, a system of federal regulatory controls, pursuant to the Federal Water Pollution Control Act (also known as the federal Clean Water Act), 33 U.S.C. §§ 1251–1376, which governs the discharge of pollutants into waters of the United States. A NPDES permit may be issued by the DEP pursuant to the regulations at 25 Pa.Code §§ 92.1–92.94.

ever, when the policy at issue is read in its entirety and in context with pertinent existing laws and regulations, it is clear that the DEP's policy is just that; it is a *plan* to bring Pennsylvania in compliance with the minimum water quality standards based on criteria developed by the EPA and research performed by the Bay Program. Those standards are the product of a collaborative process between the EPA and the Bay States and represent a scientific consensus defining the water quality conditions necessary to protect the Bay from the effects of nutrient and sediment overloading.

Unfortunately, neither the Petitioners nor the majority analyze the policy in context of the federal Clean Water Act's Chesapeake Bay Program. To view the policy in a vacuum totally disregards the Clean Water Act's requirement that Pennsylvania *must* meet the water quality standards for the Bay established by Maryland. Section 303 of the Clean Water Act *requires* that NPDES permits include any requirements necessary to achieve water quality standards established under Section 303 of the Act. Such requirements expressly include limitations for all pollutants "which may be discharged at a level which will cause, have reasonable potential to cause, or contribute to an excursion above *any State water quality standard*," not just those of the State in which the discharge occurs. 40 C.F.R. § 122.44(d)(1)(i) (emphasis added).

Moreover, a crucial consideration to determine whether a policy is a binding norm, one which the majority failed to consider, is whether the policy interprets or tracks an existing statute or regulation. Had the majority considered this factor, it would have concluded, as I do, that the Compliance Plan was a statement of policy.

A "statement of policy," is defined in Section 102 of the CDL as:

> *any document,* except an adjudication or a regulation, promulgated by an agency *which sets forth substantive* or procedural personal or property rights, privileges, immunities, duties, liabilities or *obligations* of the public or any part thereof, *and includes,* without limiting the generality of the foregoing, *any document interpreting or implementing any act of Assembly enforced or administered by such agency.*

45 P.S. § 1102(13) (emphasis added).

In other words, a statement of policy is "*one that tracks a statute and does not expand upon its plain meaning.*" Such a rule need not be issued in accordance with the Commonwealth Documents Law. *Pennsylvania Human Relations Comm'n v. Norristown Area Sch. Dist.,* 473 Pa. 334, 374 A.2d 671 (1977). *Uniontown Area School District v. Pennsylvania Human Relations Commission,* 455 Pa. 52, 313 A.2d 156 (1973).

In *Home Builders,* this Court held the Comprehensive Stormwater Policy was *not* a regulation because it constituted an approach for "*achieving compliance with existing requirements*" over which DEP retained discretion. *Home Builders,* 828 A.2d at 453 (emphasis added).

There, a homebuilders association, consisting of over 100 production and custom home builders, remodelers and land developers, filed a petition for review seeking, *inter alia,* a declaration that the Stormwater Policy was an improperly promulgated regulation because it imposed new, mandatory regulatory requirements for protecting water quality in NPDES permits that went beyond the requirements of federal and state law.

Applying the "binding norm" test this Court held that the Stormwater Policy was

not a regulation, but rather, a policy statement which described "a recommended approach *of achieving compliance with the existing requirements*" of state and federal law. *Id.* at 453. Specifically, the Policy recommended "a uniform approach to stormwater management" that the DEP believed would "assure consistency in its stormwater programs *and assure compliance with the existing use protection required by 25 Pa.Code § 93.4c(a)*." *Id.* at 453.

Similarly, in *J.R. Reynolds Inc. v. Department of Labor and Industry*, 661 A.2d 494 (Pa.Cmwlth.1995), this Court found that a formula applied by the Department of Labor for calculating fringe benefit credits was an interpretive rule and, therefore, not subject to publication requirements of the CDL.

There, Reynolds failed to adequately segregate its fringe benefits payments according to the hours that workers had labored on public works projects. To determine whether Reynolds was in compliance with the requirements of the Pennsylvania Prevailing Wage Act[2] (Act), the Department of Labor and Industry, Prevailing Wage Division (Division) applied an "averaging formula." *J.R. Reynolds*, 661 A.2d at 496. The Division determined that Reynolds underpaid its workers $11,453. Reynolds appealed.

In its determination, the Prevailing Wage Appeals Board (Board) concluded that the Division's averaging formula was an interpretation of the Act, as opposed to a legislative rule. The Board reasoned that the formula was *a mechanism for applying the law and did not improperly expand the meaning of the Act.*

This Court affirmed and concluded that the averaging formula was simply a mechanism used to apply the law to a contractor who fails to keep records required under the Act. The formula did not expand upon the plain meaning of the Act. Since the formula was an interpretive rule that tracked the Act there was no requirement that it be published or codified as a regulation pursuant to the CDL.

Similarly, the Compliance Plan at issue here does not expand upon the plain meaning of the Clean Water Act or enlarge its original purpose. The Compliance Plan identified a methodology that the DEP planned to use to arrive at cap loads which was consistent with and tracked the federal regulatory and statutory requirements.

Section 1267 of the federal Clean Water Act, 33 U.S.C. § 1267 was enacted by Congress and required the EPA to maintain a "Chesapeake Bay Program." The Bay Program was developed to assist the signatories of the "Chesapeake Bay Agreement" (Pennsylvania, Maryland, Virginia, West Virginia, Delaware and the District of Columbia) to develop and implement specific action plans to carry out the responsibilities of the Bay Program.

Section 117(g) of the federal Clean Water Act, 33 U.S.C. § 1267(g) provides:

(g) Chesapeake Bay Program

(1) Management strategies

*The Administrator, in coordination with other members of the Chesapeake Executive Council, shall ensure that management plans are developed and implementation is begun by signatories to the Chesapeake Bay Agreement to achieve and maintain*—(emphasis added).

*(A) the nutrient goals of the Chesapeake Bay Agreement for the quantity of nitrogen and phosphorus entering the Chesapeake Bay and its watershed;* (emphasis added).

**2.** Act of August 15, 1961, P.L. 987, *as amended*, 43 P.S. §§ 165-1-165-17.

(B) the water quality requirements necessary to restore living resources in the Chesapeake Bay ecosystem.

One of the goals of the Chesapeake Bay Program is to reduce the nutrient loads, specifically total nitrogen and total phosphorus. The EPA issued technical guidance for establishing water quality criteria to protect the resources of the Chesapeake Bay. The EPA's report, entitled "Technical Support Document for the Identification of Chesapeake Bay Designated uses and Attainability" set forth total loading caps for the entire bay and further refined those gross allocations to allocations of pollutants by major tributary basis and jurisdiction, including Pennsylvania. In other words, based on each tributary's nutrient and sediment input to the Bay, the EPA divided the total Chesapeake Bay pollution load proportionally to each tributary and jurisdiction. The cap load allocations established by the EPA show where the nutrient and sediment loads will most effectively be reduced to achieve restoration goals. The EPA assigned Pennsylvania specific cap loads to ensure compliance with new Maryland water quality standards in an attempt to restore the water quality of the Chesapeake Bay.

The DEP, the agency in charge of implementing the Clean Water Act, in turn, determined which portions of the nutrient load delivered came from point sources and from nonpoint sources, respectively, and assigned a cap load to each. The DEP then developed the Tributary Strategy to meet the cap loads for each category of sources. These formulas were then applied to each permittee, based on its unique design flow, to determine its cap load. In other words, *the nutrient-related restrictions in the DEP issued NPDES permits are based on these allocations.*

The DEP's Compliance Plan, including the Tributary Strategy, as its name suggests, is merely a strategy proposed by the DEP to meet existing federal statutory and regulatory requirements. It is not a regulation. The Compliance Plan sets forth no new binding requirements that are not already in place pursuant to the mandates of the federal Clean Water Act. Again, DEP's proposed nutrient management plan, which includes a proposed formula for calculating individual point source nitrogen and phosphorus cap loads, simply *tracks Section 117(g) of the federal Clean Water Act,* 33 U.S.C. § 1267(g), entitled "Chesapeake Bay Program." Section 117(g) of the federal Clean Water Act *requires* Pennsylvania to develop and implement management plans to achieve and maintain the nutrient goals *of the Chesapeake Bay Agreement* for the quantity of nitrogen and phosphorus entering the Chesapeake Bay. The Compliance Plan sets forth DEP's recommendations for achieving that compliance and the strategies it intends to put into practice to ensure that the effluent limits meet the water quality standards established under the Clean Water Act. Because the Compliance Plan imposes no "new" obligations on Petitioners that did not already exist under the Clean Water Act, it is not subject to the strictures of the Commonwealth Documents Law.

The majority does not consider the correlation between the policy at issue and the DEP's obligations under the Chesapeake Bay Agreement to reduce the amount of sediment and nutrients in the Bay by the year 2010. As a result, I believe this undermines over a decade-long collaborative process between the EPA, the DEP and the five other signatories of the Chesapeake Bay Agreement and hinders, without basis, the DEP's efforts to carry out its responsibilities under the Chesapeake Bay Program.

In light of the technically complex nature of the Clean Water Act and the reciprocal plan to restore the Chesapeake Bay, I believe this Court should favor the expertise of the DEP, the state agency responsible for implementing the Clean Water Act and the Chesapeake Bay Program. *Groce v. Department of Environmental Protection,* 921 A.2d 567 (Pa.Cmwlth.2007).

For these reasons, I would grant the DEP's petition for summary judgment, declare the Compliance Plan to be a valid statement of policy, and allow the DEP to implement the NPDES permits and Tributary Strategy to ensure Pennsylvania's compliance with federal water pollution control requirements.

President Judge LEADBETTER joins in this dissent.